## BLAKE CONSTRUCTION COMPANY, ET AL. *v.* WELLS

[No. 37, September Term, 1966.]

*Decided January 27, 1967.*

284

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS and FINAN, JJ.

*H. Algire McFaul,* with whom were *Simpson & Simpson,
Vivian V. Simpson, Joseph B. Simpson, Jr.* and *Alfred H. Car-
ter* on the brief, for appellants.

*Martin E. Gerel,* with whom was *Leonard J. Ralston, Jr.,* on
the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Dorita Wells (appellee) is the widow of James Wells, the
circumstances of whose tragic demise during the early hours
of 15 December 1962 persuaded the Workmen's Compensation
Commission to reject her claim for compensation. This is the
appeal of the employer, Blake Construction Company (Blake),
and its insurer, from the judgment of the trial judge (Pugh,
J.) reversing the action of the Commission.

The Congress has provided for the Bureau of Standards a
handsome complex of buildings at Gaithersburg, in Montgomery
County. The construction of the foundation of the one called
the Radiation Physics Building was assigned to Blake. On 14
December 1962, in an excavation 30 to 35 feet deep, Blake had
poured the concrete for one of the four walls of a room in the
sub-basement. This wall was 16 feet high. To protect the con-
crete from predicted low temperatures Blake had the wall cov-
ered with tarpaulins, extending from the top of the wall to the
ground, so as to form a sort of tent. Oil and propane heaters
were then placed on both sides of the wall between the wall and

the tarpaulins. The heaters were tended during the night by watchmen. Wells, who was assigned the 11:00 P.M. to 7:30 A.M. shift, was instructed to relieve Walter Tucker. Wells was to be relieved in the morning by Charles Brice.

Maintaining a watch on the heaters was necessary in order to keep the temperature around the concrete above 32 degrees. There was also the possibility that the flame on a propane burner might be extinguished thereby causing the tent to fill with a mixture of propane gas and air which might eventually be ignited or exploded by one of the other burners.

Although Wells had told Tucker he would be "a little late" he did not show up until 3:00 A.M. Nevertheless Tucker remained on the job looking after the heaters until Wells arrived. After Wells checked the heaters he and Tucker came up out of the excavation and they walked towards Wells' car. Tucker saw a woman sitting in the car as he passed by. He said the car was parked in such a way that the tarpaulins on one side of the wall could be seen by one sitting in the front seat.

At about 6:45 A.M. Brice arrived. He saw Wells' car and noticed that the engine was running. He looked in and he "thought * * * [Wells] was asleep and a lady was laying on his lap." They were fully clothed. Neither responded when he tapped on the window. He opened the door and saw that they were dead. He thought at the time the woman "was the madam." He learned later that she was Ruth Diggs. He then checked the heaters and he said "everything seemed to be in order."

The trial judge, in his opinion, said "the facts as presented to the court are undisputed." He said also that only the Commission's interpretation of the law was under scrutiny since "there is no dispute as to the facts." The expression "undisputed facts" appears at several other places in his opinion.

We do not agree that "there is no dispute as to the facts." Shiflet, Blake's superintendent, said there "should have been nine or ten heaters" under the tarpaulins. Brice said that when he checked the heaters after discovering the bodies of Wells and Ruth Diggs that "approximately eight to ten" heaters were in operation. On the other hand Tucker testified there were

"three [heaters there] that night." At a second hearing, six months later, when asked how many heaters were in use he replied, "Not but five, is all I had there." Tucker said it was not possible to see a heater from Wells' car nor was it possible to see whether a gas tank "needed changing from sitting in the car" but that it was possible to "see the light" of the "heater through the tarpaulin." Shiflet said that while some light might be seen from the car it would not be possible to tell "whether two or one had gone out." Moreover, he pointed out, the heaters on the other side of the wall could not be seen "because you couldn't look through the concrete form."

Judge Pugh emphasizes the "lack of any specific instructions to the employee as to where he was required to be." Shiflet said it was his duty to "stay with the heaters and see that none of them go out." Brice said, "We were told to stay with the heaters." He explained that the watchmen "would have to be down there [in the hole] to detect whether the heater went out or not, for the reason if the propane had gone out and gas escaped, you smell it and turn off the heaters to keep them from igniting." It was an order, he said, that the watchman "has to remain * * * underneath the tarpaulins in the hole * * * until relieved." Tucker, on the other hand, testified he had never received any instruction "where to sit or stand."

The statement in the court's opinion that "it cannot be inferred that the deceased deviated from his employment as he was physically present in his automobile, facing the heaters and performing his job of watchman, there being no express requirement that he be within reaching distance of the heaters every moment of his employment" overlooks the testimony of Shiflet and Brice to the contrary. Shiflet's statement that there were heaters "on both sides of the wall" is uncontradicted. Moreover it reflects obvious common sense since it would be foolish to protect one side of the wall and let the other side freeze.

The decision of the Commission is, of course, prima facie correct and the burden of proof is upon the party attacking the same. Code, Art. 101, § 56 (c). This means nothing more than that, if the mind of the trier of facts is in equal balance on the evidence in the record, the finding of the Commission should be affirmed. *Greenwalt v. Brauns Bldg. Specialties Corp.*, 203 Md.

313, 318, 100 A. 2d 804 (1953). The case at bar was submitted to the trial judge sitting without a jury. Since the parties elected not to produce any additional evidence, all that was before the court was the transcript of the proceedings before the Commission. In *Williams Constr. Co. v. Bohlen,* 189 Md. 576, 580, 56 A. 2d 694 (1948) we held that:

> "* * * where the Commission has considered evidence of essential facts, and has drawn one of two different permissible inferences, there may be imposed upon the party attacking the decision of the Commission merely a burden of persuasion, and not necessarily a burden of additional proof. He may rely upon identically the same evidence that was presented before the Commission. The provision of the Act placing the burden of proof upon the appellant means only that he must prove in the trial Court what he asserts. His burden is to convince the Court or the jury that the Commission decided incorrectly in interpreting the facts, or deducing the inference from the facts, or construing the law applicable to the facts."

Blake, therefore, was entitled, at least, to a careful consideration by the trial judge of *all* of the evidence produced before the Commission. Blake was entitled to have the trial judge weigh that evidence, all of it, in the light of the prima facie correctness of the Commission's decision and the appellee's burden of persuading him that that decision was incorrect. Blake also was entitled to have the trial judge search his mind to see if it inclined toward the appellee, toward Blake, or if it was in equal balance. And, it seems to us, Blake has a right to know what conclusion was reached by the trial judge in respect of any conflicts in the evidence. Appellee argued below, in response to Blake's motion to reconsider, that the facts "specifically enumerated" by the trial judge "were undisputed." Even if this were altogether true, and we think it is not, such eclecticism is inappropriate to the decision making process of a court of law.

We shall not undertake the resolution of the conflicting evidence. That is the function of the trial court. We have said many times that we do not weigh and evaluate conflicting evi-

dence to determine its comparative value. *Talley v. Dept. of Correction,* 230 Md. 22, 29, 185 A. 2d 352 (1962).

Since the case will be remanded we shall make a few pertinent observations which may serve to facilitate the trial judge's reappraisal of the contentions of the parties. If witnesses are still available, for instance, it might be very helpful to the trial judge to know what time death occurred and for how long before death Wells might have been unconscious or helpless. Expert testimony, if available, that Wells survived his companion for a significant length of time might support an inference that Wells left his car, one or more times, to go back into the hole to inspect the heaters. There may be a witness who could shed more light on what instructions were given to Wells. Evidence in respect of Wells' activities during the 4 hours (11:00 P.M. to 3:00 A.M.) he was elsewhere might indicate a drowsiness induced by alcohol. There may also be other material evidence the nature of which we cannot guess.

If what we suspect is true, that the record contains all the evidence that is now available, then the trial judge must reevaluate that evidence and resolve the conflicts found therein. While that, as we have said, is exclusively his function, it seems to us that the record, as it stands, could very well support a finding that Wells was instructed to "stay with the heaters." Appellee claims Tucker's testimony is to the contrary. It is deprecatory, to be sure, but it is also equivocal. He was asked, "Did you receive or did anybody working there at night give instructions where to sit or stand to do this job?" He answered, "No, sir." Since the job was to watch the heaters it would not matter much where he *sat* or *stood* as long as he was *watching the heaters,* but to watch all of the heaters he had to be under the tarpaulins. Asked if he had "ever been instructed not to sit in the automobile," he replied, "No." Despite his answer and his further statement that he himself, on occasion, "sat in * * * [his automobile]" it does not necessarily follow that it was permissible to watch the heaters from the front seat of an automobile parked where Wells was parked. One might well conclude that Tucker's concept of the responsibilities and duties of a heater watchman is revealed by his own conduct. He stayed under the tarpaulins four hours beyond the end of his

shift because he had been "told to check them until he [Wells] came to release me," because it was "a right important job" and because he "wanted to see that nothing happened."

The record could support a finding that there were 3, 5, 8, 9 or 10 heaters employed in protecting the wall from freezing. However, a finding that there were heaters on both sides of the wall seems to us inescapable. And, the physical facts compel a finding that Wells could not see the light from heaters on the far side of the wall.

Assuming that the trial judge, after further proceedings, makes findings coincident with the observations set forth above, the determination of the applicable principles of law should be free from difficulty. In *Consol. Engineering Co. v. Feikin*, 188 Md. 420, 424-5, 52 A. 2d 913 (1947) we said:

> "An injury to an employee 'arises out of' his employment within the meaning of the * * * [Code, Art. 101, § 15 (1964 Repl. Vol.)] when it results from some obligation, condition or incident of the employment. Whether an accident causing an injury to an employee resulted from some obligation, condition or incident of the employment depends upon the circumstances of each particular case. *Spencer v. Chesapeake Paperboard Co.*, 186 Md. 522, 47 A. 2d 385. An injury 'arises out of' employment when, after consideration of all the facts and circumstances of the case, it is apparent to the rational mind that there was a causal connection between the conditions under which the work is required to be performed and the ensuing injury. An injury arises 'in the course of' employment when it occurs while the workman is doing the duty which he is employed to perform. The causative danger must be incidental to the nature of the business, and not independent of the relation of master and servant. If the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the situation, as a result of the exposure occasioned by the nature of the employment, it may be said to have arisen out of the employment. On the other hand, it is not the purpose

of the Workmen's Compensation Act to impose upon the employer the obligation of a general insurer, and it should not be so construed as to allow compensation in any case in which the injury which is the basis of the claim cannot be attributed to some service or act in the employment or found to be reasonably incidental thereto, but ensues from a hazard to which the workman would have been equally exposed apart from his employment. *Owners' Realty Co. v. Bailey,* 153 Md. 274, 284, 138 A. 235; *Hill v. Liberty Motor & Engineering Corporation,* 185 Md. 596, 45 A. 2d 467; *Rice v. Revere Copper & Brass, Inc.,* 186 Md. 561, 48 A. 2d 166."

The rule above set forth has been restated, paraphrased and refined in *Perdue v. Brittingham,* 186 Md. 393, 47 A. 2d 491 (1946); *Watson v. Grimm,* 200 Md. 461, 90 A. 2d 180 (1952); *Scherr v. Miller,* 229 Md. 538, 184 A. 2d 916 (1962); *Dep't of Correction v. Harris,* 232 Md. 180, 192 A. 2d 479 (1963); *Miller v. Coles,* 232 Md. 522, 194 A. 2d 614 (1963); *Pariser Bakery v. Koontz,* 239 Md. 586, 212 A. 2d 324 (1965); *Coates v. J. M. Bucheimer Co.,* 242 Md. 198, 218 A. 2d 191 (1966).

Again assuming a finding coincident with our observations we are unable to discern any causal connection between the conditions under which Wells' work was required to be performed and his death. Asphyxiation by carbon monoxide was not a natural incident of the job he was employed to perform. Appellee argues that the freezing weather forced Wells to sit in his warm car. Such an argument loses most of its force when one considers that Tucker, who had been in the "hole" tending the heaters for 10 to 12 hours, did not complain of the cold nor did he desert his post. Wells was employed to "stay with the heaters." He was not employed to sit in his car with a lady friend where he could not see the heaters on the far side of the wall and where he could see only a faint glow from the heaters on the near side. Judge Pugh thought that because "the heaters were burning at all times" after Wells reported for work "that there was no neglect" on his part. One might as well say

that the sentry found asleep at his post ought not be punished because no enemy came to be challenged. The heaters, to be sure, burned all night but that would have been the case if Wells, after relieving Tucker, had gone home to bed. In either event the heaters on the far side of the wall could have gone out and he would not have known it.

It is common knowledge that sitting in a parked automobile with the windows closed and the engine running may result in death. Wells' exposure to this hazard seems not to have been required by the nature of his employment and certainly it was a hazard he shared in common with all users of motor vehicles.

*Judgment reversed and case remanded for further proceedings, not inconsistent with the views expressed in this opinion.*

*Costs to abide the result of further proceedings.*