EGYPT FARMS, INC. ET AL. *v.* LORRAINE S. LEPLEY

[No. 1505, September Term, 1980.]

*Decided June 8, 1981.*

The cause was argued before Lowe, Liss and Wilner, JJ.

*R. Roger Drechsler,* with whom were *Lord, Whip & Green, P.A.* on the brief, for appellants.

*Peter V. Gargano* for appellee.

WILNER, J., delivered the opinion of the Court.

The precise question before us in this appeal is whether the Circuit Court for Baltimore County erred in affirming a decision of the Workmen's Compensation Commission by means of summary judgment. At issue is not only the substantive correctness of the court's findings — that Maurice Lepley's death by asphyxiation arose out of and in the course of his employment and was not the product of willful misconduct on his part — but also whether those findings could properly be made by means of summary judgment.

We have no particular difficulty with the first issue; following an evidentiary proceeding of the type provided for by Md. Ann. Code art. 101, § 56, the court could properly have reached the conclusions noted. We think, however, that it erred in reaching one of those conclusions on summary judgment, for there was evidence in the record (and permissible inferences from that evidence) that could have led to a conclusion that Mr. Lepley's death did not arise out of and in the course of his employment.

The record upon which the court granted summary judgment was that made before the Commission. No additional evidence was considered.

Mr. Lepley was employed by Egypt Farms, Inc. as a mechanic. His "main work," according to his widow, the claimant-appellee, was "cooking topsoil," although it was undisputed that "[h]e worked every kind of work there was to do. He did everything. He did mechanic work." He started up the employer's trucks in the morning, and kept them in repair. He occasionally worked on his "boss's" car, the boss's daughter's car, and the secretary's car, all at the employer's garage.

Mr. Lepley had an old pick-up truck that he used regularly

to commute to and from work.[1] Indeed, it was this truck, and his manner of using it, that forms the heart of this controversy.

It was conceded that Lepley occasionally used his truck in the direct service of his employer. He was not required so to use it, but he did so in a number of ways with his employer's knowledge and consent. On one occasion, shortly before his death, he used his truck on a business trip to Virginia. More frequently, he used it either to reach the scene of one of his employer's vehicles that had broken down on the road or simply to travel around the "yard," although there were company vehicles he could have used for either purpose. Because of his periodic use of the truck at work, he kept his tools — those that he used in his work — in his truck. According to Mrs. Lepley, the employer supplied him with some gasoline and some parts for the truck.

Mr. Lepley used his employer's garage to work on — *i.e.,* repair — his truck. Mrs. Lepley said that it was "the only place he had to work on it," but, in any event, there was no dispute that the employer knew and acquiesced in Lepley's use of its garage for that purpose.

Lepley's work schedule was somewhat erratic. According to his widow, "[h]e worked from 6:00 in the morning sometimes until 11:00 or 12:00 at night depending on how busy they were at the particular time." It was a seasonal business, she said, and he was then in the busy season. She stated that "[h]e was on call all the time. Anytime they needed him they could call him, Saturday, Sunday, nights, anytime at all he would go." Because of that, Mr. Lepley had a key to the employer's property.

The facts related so far were essentially undisputed. The problem arises from the circumstances surrounding Mr. Lepley's death.

He died sometime between the evening of Saturday, May

---

1. Actually, the truck was owned by a George Fox, but Lepley had the free and unrestricted use of it. For purposes of this case, we may properly treat the truck as though it belonged to Lepley. Mr. Fox's interest in it (or, conversely, Lepley's less than ownership interest in it) has no bearing on the issues before us.

12, 1979, and the next morning. Mr. Lepley had worked that Saturday. According to Mr. Strickland, the president and owner of Egypt Farms, he and Lepley had been working since 6:00 or 6:30 a.m. He last saw Lepley "in the back of the shop" at about 5:00 or 6:00 p.m. *The work day was over,* he said, and they were "discussing what we were going to do next week and it was a hot sunny afternoon we all had a beer." Strickland emphasized the beer drinking in the context of his assertion that the work day had ended:

"A That was one of the . . . of the very important things that we stressed there was that we knew when quitting time was because you could hear Maurice [Lepley] popping a beer.

Q Was any drinking allowed on the premises during work hours?

A Absolutely not.

Q Why was that, sir?

A Well, you don't mess around with equipment when you're drinking and you can't work properly when you're drinking."

Where the beer came from is not entirely clear. There was testimony from a barmaid at a nearby tavern that Mr. Lepley had been there earlier that afternoon — about 4:30 p.m. — that he drank two bottles of beer and bought a "six pack" to go. It was argued that her testimony, particularly as to the time of Mr. Lepley's visit, was inconsistent with other testimony that Lepley was at work until 5:00 or 6:00 p.m. Inferences could be drawn either way, of course — that she was mistaken as to the time and that Lepley was there later, or that Lepley simply left work temporarily and returned prior to his last conversation with Mr. Strickland. There was a refrigerator at the shop in which the men kept beer. Occasionally, Mr. Strickland would buy some beer for the men.

It is apparent that Mr. Lepley remained at or returned to the shop after Strickland and the others left, but different inferences could be drawn as to why. He was found the next

morning by a co-worker lying on a "creeper" behind his truck, dead. The garage door was closed; his entire box of tools was beside him. According to the autopsy report, he had died of carbon monoxide intoxication. One clearly permissible inference, of course, was that Mr. Lepley had died while working on his truck; and that is what the medical examiner assumed. Mr. Strickland, however, found it "a little unusual that [Lepley] would crawl under a truck with an entire box of tools. Maurice was such a good mechanic he would generally know about what he needed. And to go under . . . he'd take just a few tools with him, exactly what he needed." Strickland believed (and testified) that Lepley had "c[o]me in there to sleep off a drunk. . . ." [2]

On these facts, the Commission found that Lepley's death had arisen out of and in the course of his employment and that it was not the product of willful misconduct on his part.[3] On appeal, the court concluded that there was no dispute of fact and the record permitted "only one permissible inference" — that the Commission reached the only possible conclusion. On that basis, it granted appellee's motion for summary judgment.

In *Montgomery Ward & Co., Inc. v. Bell,* 46 Md. App. 37 (1980), we discussed the role of a court when reviewing a decision of the Workmen's Compensation Commission. At p. 42, we noted that where, as here, the case involves an accidental injury, "the court must determine three things: (i) did the Commission justly consider all the facts concerning the injury; (ii) did the Commission exceed its statutory authority; and (iii) did the Commission misconstrue the facts or the law applicable to the case?" We also observed, however (p.

---

**2.** There was nothing directly in the record to indicate what happened to the beer purchased by Lepley. There was no evidence of empty bottles, for example. The autopsy report noted a blood alcohol content of 0.18%, which would indicate that Lepley had a good bit to drink before he died. As the employer did not contend that Lepley's death arose from voluntary intoxication, that issue is not before us. We note the apparent alcohol consumption only in connection with Strickland's testimony about drinking during work hours.

**3.** Other issues were also raised by the employer before the Commission. They too were decided adversely to the employer, who did not pursue them on appeal. We are therefore not concerned with them.

41), that in making those determinations, the reviewing court has very broad authority, notwithstanding the *prima facie* correctness of the administrative decision. This review, said the Court in *Maryland Bureau of Mines v. Powers,* 258 Md. 379, 382 (1970), "extends both to findings of fact and applicable law" and "provides for a trial which is essentially de novo." The court (or jury), in other words, is not so bound by the Commission's fact findings as is normally the case in administrative appeals, but is free to weigh the evidence (and the inferences from it) and reach entirely opposite conclusions. Thus, the normal rules governing summary judgment apply with equal force to Workmen's Compensation appeals. Those rules were recently summarized in *Peck v. Baltimore County,* 286 Md. 368, 381 (1979) (citations omitted):

> "We have said many times that the function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to ascertain whether there is a dispute as to a material fact sufficient to provide an issue to be tried.... Moreover, all inferences must be resolved against the moving party when a determination is made as to whether a factual dispute exists, even if the underlying facts are undisputed.... Also, [citing *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970)], '*[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.*'" (Emphasis supplied.)

This is the framework within which we must review the court's action. Within that framework, it is clear that the court could properly conclude, on summary judgment, that Lepley's death was not the result of his own willful misconduct. At best, applying every inference in favor of the employer, the record supports nothing more than negligence on Lepley's part. He should have known better than to run

the motor in a closed garage without proper ventilation, or, (if that is what he was doing) to work on the vehicle after drinking. But, as we said in *Williams Construction Co., Inc. v. Garrison,* 42 Md. App. 340, 345 (1979), "the right to compensation exists without reference to the care of the employee, and compensation is not denied by reason of contributory negligence on his part." *See also Dayton v. Davis,* 218 Md. 614 (1959); *Harris v. R. P. Dobson & Co.,* 150 Md. 71 (1926); *Red Star Motor Coaches, Inc. v. Chatham,* 163 Md. 412 (1933).

The problem, as we have noted, is with the court's other conclusion — that the death arose out of and in the course of Lepley's employment.

Long ago, the Court of Appeals stated that "an injury to an employee arises out of his employment if it results from the nature, conditions, obligations, or incidents of the employment. Whether an accident is so related or incident to the employment depends upon the circumstances of each particular case. No exact formula can be laid down which will automatically solve every case." *Spencer v. Chesapeake Paperboard Co.,* 186 Md. 522, 525 (1946), and cases cited therein; *see also Saylor v. Black & Decker Manufacturing Co.,* 258 Md. 605, 611 (1970).

This is particularly true with respect to the matter now before us. There have been several dozen cases around the country involving the question of whether an injury sustained by an employee while repairing his own vehicle used, in whole or in part, in the course of his employment, is compensable — whether the injury may be regarded as arising out of and in the course of his employment. There is no uniform pattern; the cases, at least on the surface, appear to be in conflict. What emerges from these cases is fairly summarized in 99 C.J.S. *Workmen's Compensation,* § 221b (pp. 735-36):

> "There is much conflict and confusion in the cases as to whether or not an injury suffered by an employee while repairing a motor vehicle which he owns and uses in his employer's business is compen-

sable. Some authorities regard the repair of the vehicle as a matter purely personal to the employee so that an injury in the course thereof is not compensable, at least where the employee is not at the time on an errand for his employer. Even where the vehicle breaks down on the job, an injury suffered in connection with its removal and repair has been held not to be compensable.

On the other hand, where the employee is required to use his vehicle on the job, the repair of the vehicle has been regarded as an incident of the employment, so that the employee is entitled to compensation for an injury in the course thereof. Accordingly, an injury to an employee putting his own vehicle into condition for use in the employer's business during the employee's usual hours of labor has been held to arise out of and in the course of the employment; but, where the vehicle is being prepared for general use, the injury does not arise in the course of employment.

Where the employee was not required to use his own truck, his injury suffered while repairing it outside his regular hours of work and off the premises of the employer was held not compensable. An injury suffered by an employee repairing his own vehicle was denied compensation where he was required to supply his own transportation, but was permitted to garage his motor vehicle on the employer's premises. Where the employee's duties require him to use his own vehicle part of the time and another at other times, an injury sustained while he is putting his own away preparatory to using the other was held to arise out of and in the course of the employment." (Footnotes omitted.)

None of the cases cited in support of those statements, and indeed no other case referred to or found by us is precisely like the one before us. Many of the cases holding the injury to be non-compensable have involved situations where the

injured party was a driver who owned his truck which he leased to and drove for the employer, and who was responsible under the lease agreement for keeping the vehicle in good repair. Injuries sustained while repairing the truck (or having it towed for repairs) at some place other than the employer's facility were held not to arise out of or in the course of employment, but rather were in pursuance of the claimant's lease obligations. *See, for example, McKay v. Crowell & Spencer Lumber Co.,* 189 So. 508, (La. App. 1939); *McDonald v. Denison,* 185 P.2d 508 (N.M. 1946); *Deaton Truck Line, Inc. v. Acker,* 74 So. 2d 717 (Ala. 1954), *reaff. after remand,* 98 So. 2d 429 (Ala. 1957); *Jarman v. Trucking, Inc.,* 282 N.W. 218 (Mich. 1938); *Rector v. Ragnar-Benson, Inc.,* 21 N.W.2d 129 (Mich. 1946); *Stuhr v. State Industrial Accident Commission,* 208 P.2d 450 (Ore. 1949); *Continental Turpentine & Rosin Corp. v. Palmer,* 129 So. 2d 409 (Fla. 1961). *Compare, however, Lloyd v. Administrator, Bureau of Workmen's Compensation,* 201 N.E.2d 804 (Ohio App. 1963), in which the court affirmed a jury verdict reaching an opposite result in a similar type of case.

A more analogous case, in which the injury was also held to be non-compensable was *Superior Insurance Company v. Jackson,* 291 S.W.2d 689 (Tex. 1956). The claimant there was a mechanic employed by a contractor to keep its trucks in repair. He used his own truck (in which he transported his and his employer's tools) in the performance of his duties. The employer furnished gas and oil for the truck. The claimant normally worked a 5½ day workweek, eight hours a day. He was injured while repairing his truck at home on a Sunday (a non-work day). On these facts, the Court said (pp. 691-92):

> "In this case repairs were being made by the respondent on his own truck without the knowledge of or approval or supervision by his employer, without any contract to receive pay for making the repairs on Sunday and without expectation of receiving any. We think under the circumstances the work was of no accommodation to the employer nor in the furtherance of the employer's business,

but rather was for the benefit of the employee-respondent to enable him to pursue his own preferred plan of using his own truck in the performance of his work rather than to use the equipment of his employer. The evidence reveals, and by respondent's own testimony, that he was not being paid anything for the use of his truck; that the company had trucks available and that respondent used his own truck because it was more convenient for him to do so. . . ."

*See also Stevens v. C. B. Parker Co., Inc.,* 165 A. 665 (Pa. Super. 1933); *Owens v. McCallum & Forber,* 97 P.2d 754 (Okla. 1939); *Pettet v. Monroe County Emergency Work Bureau,* 289 N.Y.S. 29 (App. Div. 1936); *Freedman v. M. Shottenfeld & Sons, Inc.,* 9 N.Y.S.2d 88 (App. Div. 1939).

Other courts, in different circumstances, have held injuries received while repairing vehicles used both for personal and business use to be compensable. *See, for example, Waters v. Service Oil Co.,* 44 A.2d 709 (Conn. 1945). The claimant there was a mechanic employed to make emergency repairs on oil burners. He was on call all the time, twenty-four hours a day, seven days a week. He used his own car to go to and from his jobs and kept his tools in it; the employer furnished gas and oil. The injury occurred while the claimant was repairing his car at home on a Sunday. On those facts, the Court concluded (pp. 710-11):

"The injury occurred at a place where the plaintiff could reasonably be and at a time when he was reasonably fulfilling the duties of his employment or doing something incidental to it. The contract of employment contemplated that when at home on Sundays he would be ready to go out on emergency calls. He was making necessary repairs to the automobile so as to be able to go on a call when it came in. This was necessarily contemplated by his contract of employment and the employer knew that the plaintiff made such repairs in order that the car might be available for use on emergency

calls. He was doing work for his employer's benefit, not for his own. The conclusion of the commissioner that the plaintiff's injury arose in the course of his employment is one that he could reasonably reach."

*See also Struve v. Fremont,* 250 N.W. 663 (Neb. 1933), where, applying similar reasoning, the Court held compensable the death by asphyxiation of a local fire chief, on duty all the time, while repairing his car that he regularly used in his employment; *Derleth v. Roach & Seeber Co.,* 198 N.W. 948 (Mich. 1924); *Chrisman v. Farmers Cooperative Association of Bradshaw,* 140 N.W.2d 809 (Neb. 1966); *Hanchett v. Brezner Tanning Company,* 221 A.2d 246 (N.H. 1966); *Welch v. North Dakota Workmen's Compensation Bureau,* 31 N.W.2d 498 (N.D. 1948); *Mackay v. Department of Labor and Industries,* 44 P.2d 793 (Wash. 1935); *Blatt v. Metropolitan Life Insurance Co.,* 413 S.W.2d 533 (Mo. App. 1967); *Shell Oil Co. v. Industrial Accident Commission,* 199 Cal. App. 2d 426 (Cal. App. 1962); *Fels v. Industrial Commission,* 69 N.W.2d 225 (Wis. 1955); *Pressed Steel Car Co. v. Industrial Commission,* 172 N.E. 52 (Ill. 1930).

None of these cases, whether holding the injury compensable or non-compensable, purported to set down any broad principle of law that would be generally applicable in all cases involving injuries arising from the repair by a claimant of his own vehicle. They did no more than affirm or reverse awards based on the particular fact situations before them. They looked at and based their ultimate conclusions on such factors as whether the claimant was actually on duty at the time, whether the use of his personal vehicle in the course of his employment was required or expected or was merely for the claimant's convenience, whether the repairs were authorized by the employer, and whether they were made at the employer's facility or elsewhere; and these were different from case to case.

Upon this authority and the more general principles announced by the Maryland appellate courts, had the court discounted Mr. Strickland's testimony, it could reasonably have found that Mr. Lepley had remained (or returned) to

work on his truck, that the repair of his truck was for the benefit of the employer, that he was thus engaged in his employment when making those repairs, and that his death therefore arose out of and in the course of his employment. But if Strickland's testimony is credited, a fair and reasonable inference could be drawn that, by reason of Lepley's drinking, his work day was over, and that any work he did on his truck thereafter was not only for his own benefit and not in pursuance of his employment, but was actually unauthorized and forbidden. Unlike the oil burner mechanic in *Waters, supra,* or the fire chief in *Struve, supra,* Lepley was not, according to Strickland, actually on duty all the time, and definitely was not on duty that Saturday evening. Under that circumstance, the case is more akin to *Superior Insurance Company v. Jackson, supra.* The court's error was in resolving the disparate inferences in the claimant's favor on summary judgment. In doing so, it acted as a trier of fact, which was not its function at that point.

As we have noted, the summary judgment on the issue of willful misconduct may stand, but as to the issue of whether the death arose out of and in the course of Lepley's employment, it must be reversed.

> *Judgment affirmed in part and reversed in part; case remanded for trial on issue of whether injury arose out of and in course of employment; costs to be divided equally between the parties.*