867 A.2d 370

## BOARD OF EDUCATION FOR MONTGOMERY COUNTY, Maryland

v.

### Joannie M. SPRADLIN.

### No. 0320 Sept. Term, 2004.

Court of Special Appeals of Maryland.

Jan. 31, 2005.

John T. Beamer (Charles W. Thompson, Jr., Karen L. Federman Henry, on the brief), Rockville, for Appellant.

Jonathan S. Beiser, Rockville, for Appellee.

JAMES R. EYLER, BARBERA, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (Retired, Specially Assigned).

### When, If Ever, Is the Past Prologue?

There is first the administrative appeal; and, then, there is the administrative appeal plus. An appeal to the circuit court from a decision of the Workers' Compensation Commission is, not invariably but more frequently than not, by way of the administrative appeal plus. The statutory provision for circuit court review offers the appellant not one but two reviewing options. The first is that of a generic and routine administrative appeal, a familiar process with familiar constraints. "Did the agency fall into legal error?" The "plus" option, by intriguing contrast, is more wide-ranging. It permits revisiting the facts, supplementing the facts, or simply appraising the facts afresh, even in the total absence of any antecedent error. "The decision of the Commission appears to have been impeccably correct; but we nonetheless arrive at a diametrically different result." Our consideration of this appeal requires an in-depth examination of some of the procedural nuances attendant on that "plus" option. When a proceeding is "essentially," but not totally, *de novo*, to what extent, if any, is the past prologue?

### The Workers' Compensation Claim

The appellee, Joannie M. Spradlin ("the claimant"), filed a claim with the Workers' Compensation Commission, requesting compensation benefits for injuries sustained by her after being assaulted by a co-employee. Before the Commission, the appellant employer, the Board of Education for Montgomery County, claimed, *inter alia*, that the claimant's own wilful misconduct, in instigating the fight with the co-employee, barred her recovery. It also claimed, as an alternative defense, that the injury to the claimant did not 1) occur in the course of the claimant's employment or 2) arise out of that employment. Without meaningful elaboration, the Commission ruled against the claimant and denied her claim.

The claimant appealed the Commission's decision to the Circuit Court for Montgomery County. She opted for a *de novo* trial before Judge William J. Rowan, III, sitting without a jury. Judge Rowan, as the fact finder, was persuaded that the claimant had "sustained an accidental personal injury in the course of employment" and accordingly reversed the decision of the Commission. On this appeal, Montgomery County poses the question:

> Once the circuit court determined that the claimant and the employer's witness were equally credible, *should the court have given due weight to the presumption of correctness of the Commission's decision?*

(Emphasis supplied).

### What Was "The Commission's Decision?"

That is not a simple question. It is a generative question that begets not an answer, but only other questions. Putting aside, for the moment, the intricate problem of what it is that a *de novo* fact finder may, or must, do with the presumption of antecedent correctness of the Commission's decision, what actually was "the Commission's decision?" It was, at the very least, the Commission's ultimate ruling disallowing the claim, but was it anything more than that? If, in arriving at its "decision" on a claim, the Commission arguably resolved ("decided") one or a series of factually disputed sub-issues, did each such resolution of an intermediate sub-issue, *ipso facto,* become a part of "the Commission's decision" to which the presumption of correctness applies? Is the Commission's putative reasoning process inextricably wrapped into "the Commission's decision?" How finely do we parse the concept of "the Commission's decision" before we pay it due obeisance?

In terms of what officially was the Commission's decision in this case, we have only the bare bones. Two issues were before the Commission, only one of which was ultimately decided. It was:

1. Did the employee sustain an accidental personal injury arising out of and in the course of employment?

On that issue, the Commission answered:

*The Commission finds* on the issues presented *that the claimant did not sustain an accidental injury arising out of and in the course of employment* as alleged to have occurred on November 22, 2002; and finds that the remaining issue is moot, and the Commission will disallow the claim filed herein.

(Emphasis supplied). It is on that spare foundation that Montgomery County constructs an elaborate argument.

## The Factual Dispute Before the Commission

At the June 18, 2003, hearing before the Workers' Compensation Commission, only two witnesses were called: 1) the claimant and 2) her co-worker and alleged assailant, Angela Harris. The assault that precipitated the claim in this case occurred on November 22, 2002, at the West Farm Depot of the Montgomery County Board of Education, where both the claimant and Angela Harris were employed. The West Farm Depot provides a kitchen area and a break room for bus attendants before they board the school busses. The claimant and Ms. Harris gave diametrically opposite accounts of a verbal confrontation between them that occurred, initially over the changing of a television channel, in the break room.

According to the testimony of the claimant, she was the innocent victim of an unprovoked attack. She was in the lounge provided by Montgomery County for its bus attendants moments before leaving to go on her bus run. She had, shortly before, been watching channel 7 on the television set; had left the room briefly; and then returned to find that the set had been switched to channel 9. The claimant described what then occurred, both inside the lounge and outside at the bus-boarding area.

I had asked my coworker to change the TV because I had been watching channel 7. She said, yes, she changed it to channel 9. I started to leave, pick up my stuff and I said,

well, it's just as well because I have to go on my bus run anyway. She said, I know you're not talking to me. You come back here if you're talking to me. I said, no, if I was talking to you, I'd come and say it to your face.

The next thing you know, I'm walking out the door, and I heard her say it again. She had threatened to "F'" me up and kept saying I was talking to her, come back and say what I had to say. I walked around the corner. She followed me outside, came out there. She got up in my face. She pointed her finger at me, and she said, "Now you say what you have to say." And then after that I said, "No." There were a lot of people around, and I said, "I have nothing to say to you."

So, she pushed me back this way (indicating). She put her foot in my chest and started punching me, hitting me in the head, pulled my earring completely out of my ear. And that was basically it. I just put my hands up to defend myself.

The claimant promptly reported the incident to her supervisor, Peggy Proctor. She also filed a report with the police. She was subsequently taken by her bus driver to the Holy Cross Hospital, where she received a chest x-ray and some medication. The only wrinkle pursued by Montgomery County during its cross-examination seemed to go to the question of whether, when the claimant was in the lounge, she was "in the course of her employment."

Q Now, you weren't actually on the clock when this alleged incident occurred, were you?

A No, it was during break time.

Angela Harris, the ultimate assailant, testified to a diametrically different version of the conversation that became the apparent *casus belli*.

I was sitting there watching television. No one was there. She came in. She asked me did I turn the television. So, I said, "Yes, I turned the TV." She said, "Well, I was watching the TV." So, I said, "Well, you must be a ghost because there was no one in here but me," and one lady walked out

before she came. She caught [sic] an attitude. She started calling me all kind of names. So, she called me the N word, and I got up and asked her what did she say.

By the time I got up, she ran out the sitting room and went to the front where everybody can see her. So, I asked her what did she say, be a woman and say what she said. And then that's when she had a water bottle, had a frozen water bottle. She threw her water bottle at me, I caught it, threw it back at her. She ran up to me and then somebody told me to watch out, and that's when the fight—altercation applied [sic].

Q Based on the fact that she called you the N word, the situation evolved into an altercation?

A Yes, it did.

Q Did she call you anything other than the N word?

A Yes, she did.

Q What else did she call you?

A She called me the B word. First, she called me the B word. Then she called me the N word.[1] That's when she vacated the sitting room and went to the front so everybody can see her. So that's when I asked her what did she call me, be a woman and say what she said.

On cross-examination, Ms. Harris acknowledged having kicked the claimant.

Q Did you kick Ms. Spradlin in the chest?

A Yes. The reason why I kicked her in the chest was because I had an injury myself. An entertainment center fell on me at Kmart, and I was in pain, too. I had my back turned. When she threw the water bottle, I threw it back at her, turned my back to ask what is wrong with this lady, is she crazy or something. Somebody told me to watch out. The only thing I could do was kick her.

---

1. By common consensus, the B word was "bitch" and the N word was "nigger."

In brief argument before the Commission, Montgomery County urged two unrelated propositions, either one of which might have sufficed to defeat the claim. It argued that the claimant was guilty of wilful misconduct in uttering the words that instigated the fight, thereby barring her recovery.[2] It also argued, at equal length and with equal vigor, that the injury did not arise either "in the course of" or "out of" the employment.

> [S]he didn't have a car, and she couldn't go home and she was sitting in the break room just because she had nothing else to do.

> Her employer did not require her to be in the break room. Her employer did not [incur] a benefit as a result of her being in the break room. And as a result of that, I do not believe that, based on the facts provided today, this incident arose out of and in the course of employment.

The unilluminating conclusory finding of the Commission did not state on which defense theory, if either, it was relying. If anything, the conclusion that "the claimant did not sustain an accidental injury arising out of and in the course of

---

**2.** In pushing the wilful misconduct argument, Montgomery County relied heavily on *Hill v. Liberty Motor & Engineering,* 185 Md. 596, 45 A.2d 467 (1946). The reliance, however, is misplaced. The injury in *Hill v. Liberty,* ultimately leading to death, resulted directly from the physical horse-play which the injured employee had instituted and not simply from an earlier use of provocative words. The cause-and-effect relationship was linear and direct and not attenuated.

Far more to the point is that the Commission, in *Hill v. Liberty,* denied the claim and the circuit court, on *de novo* review, affirmed the Commission. The actual holding of the Court of Appeals, 185 Md. at 608, 45 A.2d 467, was: "We are not prepared to say that ... the judgment of the Trial Court was clearly erroneous." That deferential standard of appellate review by no means suggests that an opposite verdict by the trial court would have resulted in an appellate reversal. It may well have been that the Court of Appeals would have affirmed the trial court's verdict as not clearly erroneous whichever way the trial court went. The holding of the case, therefore, stands for nothing more remarkable than that, on a disputed issue of fact, a fact finder may legitimately find in either direction. That would hurt Montgomery County in this case, rather than help it.

employment," with no reference to the affirmative defense of wilful misconduct as a bar to recovery, would seem to tilt away from wilful misconduct as the probable basis for the decision.[3] We may, however, be reading more into the lines than the author ever intended. Whatever the unsaid reason for the decision, the decision itself was clear. The claim was disallowed.

### A Choice of Appellate Strategies

Aggrieved at the Commission's decision, the claimant decided to appeal it to the circuit court. At that point, she found spread before her at least a modest smorgasbord of appellate selections. In *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 364, 689 A.2d 1301 (1997), we noted the plurality of available appellate strategies.

> There are, of course, two alternative modalities that an appeal from the Workers' Compensation Commission may follow.

*See also Applied Industrial Technologies v. Ludemann,* 148 Md.App. 272, 282, 811 A.2d 845 (2002). R.P. Gilbert and R.L. Humphrey, *Maryland Workers' Compensation Handbook* (2d ed. 1993), § 17.4, p. 342, similarly observed:

> The practice is that *appeals are presented to trial courts in one of two fashions:* (1) the submission of the case to the judge on the basis of the record made before the Commis-

---

3. This suggested *ratio decidendi,* ironically, does not address the further distinction between the separate requirements that an accident 1) *occur in the course of employment* and also 2) *arise out of the employment.*

See the excellent discussion of this distinction by Judge Raker in *Livering v. Richardson's Restaurant,* 374 Md. 566, 574–81, 823 A.2d 687 (2003). And see *Montgomery County v. Wade,* 345 Md. 1, 9–11, 690 A.2d 990 (1997); *Mulready v. University Research Corp.,* 360 Md. 51, 57–66, 756 A.2d 575 (2000); *Knoche v. Cox,* 282 Md. 447, 455–57, 385 A.2d 1179 (1978); *Pariser Bakery v. Koontz,* 239 Md. 586, 589–91, 212 A.2d 324 (1965); *Rice v. Revere Copper and Brass,* 186 Md. 561, 48 A.2d 166 (1946); *Perdue v. Brittingham,* 186 Md. 393, 47 A.2d 491 (1946); *Montgomery County v. Smith,* 144 Md.App. 548, 557–79, 799 A.2d 406 (2002).

sion; or (2) a *de novo* evidentiary hearing before the court sitting with or without a jury.

(Emphasis supplied).

## Option # 1:

### An Unadorned Administrative Appeal

From the first enactment of the Workmen's Compensation Act by Chapter 800 of the Acts of 1914, Maryland has provided two different strategies of appeal to the circuit court from a decision of the Workers' Compensation Commission, formerly known as the Workmen's Compensation Commission and before that as the State Industrial Accident Commission. The first of the available appellate modalities, essentially unchanged since 1914, is now spelled out by Maryland Code, Labor and Employment Article, § 9–745(c) and (e). It is in every respect a routine administrative appeal. It is an appeal to the judge alone, and, even then, only in his capacity of a legal referee and not in the capacity of a fact finder. As with appeals from other administrative agencies, the judge reviews the record of the proceeding before the Commission and decides, purely as a matter of law, whether the Commission acted properly. Subsection (c), entitled "Determination by court," spells out:

(c) *Determination by court.*—The court shall determine whether the Commission:

(1) justly considered all of the facts about the accidental personal injury, occupational disease, or compensable hernia;

(2) exceeded the powers granted to it under this title; or

(3) misconstrued the law and facts applicable in the case decided.

Subsection (e) then clearly makes the ultimate disposition of the appeal turn on the determination of whether the Commission, as a matter of law, acted correctly or incorrectly.

(e) *Disposition.*—(1) If the court determines that the Commission acted within its powers and correctly construed

the law and facts, the court shall confirm the decision of the Commission.

(2) If the court determines that the Commission did not act within its powers or did not correctly construe the law and facts, the court shall reverse or modify the decision or remand the case to the Commission for further proceedings.

■ The reference in subsection (c) to whether the Commission "misconstrued the law" is free of ambiguity. The reference to whether the Commission "misconstrued the ... facts," on the other hand, does, or once did, present a potential semantic snare.[4] As legal science has developed, however, it

---

4. There was, to be sure, an earlier time in the life of the law when reviewing tribunals labored under the intellectual conceit that if they, *de novo*, construed the testimony and other evidence differently than a lesser tribunal had done, the lesser tribunal must have been guilty, *ipso facto*, of having "misconstrued" the facts. In *General Motors Corp. v. Bark*, 79 Md.App. 68, 76–77, 555 A.2d 542 (1989), we attempted to lay this ghost of reviewing conceit to final rest.

Another possible reconciliation of the apparently inconsistent provisions may lie in the semantic probability that the statutory language of 1914, still unchanged, reflects a time when our understanding of the range of legitimate fact finding had not reached its present level of sophistication. There appears to have been an intellectual arrogance or conceit on the part of earlier reviewing authorities that if they, by way of supervening or *de novo* fact finding, came to a different conclusion than that reached by the initial fact finder, that necessarily implied that the initial fact finder had *ipso facto* been wrong or had thereby "misconstrued the facts."

If that be the case, it is an unfortunate conceit. *Since both the initial fact finder and the supervening fact finder enjoy the same prerogative independently to assess credibility and independently to weigh evidence, they may with equal validity reach different conclusions even upon the same record. A fortiori, they may do so when the witnesses testify afresh at the trial de novo, quite possibly with differences the second time around both in the substance of their testimony and in their demeanors as they testify. Because, moreover, additional evidence may be presented at the trial de novo that had not been before the Commission, the additional evidence may compel a de novo finding that could not reasonably have been reached by the Commission without the benefit of such evidence. Under such circumstances, the Commission clearly could not be held to have "misconstrued the facts" before it.* The flaw is in the misperception that every problem has a single correct solution.

(Emphasis supplied). The alternative appellate modality of *de novo* fact-finding, about to be discussed, is an avenue of relief separate and

should now be clear that that reference is only to the issue of whether the Commission's fact-finding was, as a matter of law, clearly erroneous because not supported by legally sufficient evidence. It is our firm and well-considered opinion that "misconstruing the facts" means fact-finding that is clearly erroneous and does not mean simply finding a version of the facts that happens to be different from the one found *de novo* by a reviewing court.[5] As subsection (c) expressly provides, the question of whether the Commission "misconstrued the ... facts" calls for a "Determination by Court" and does not depend upon the random chance of whether a *de novo* jury happened to reach a different conclusion from that reached by the Commission.

In *Thomas v. Thompson*, 114 Md.App. at 364, 689 A.2d 1301, we discussed how this modality of appeal from the decision of the Commission is indistinguishable from a routine administrative appeal.

> [This type of appeal] is pursuant to Labor and Employment Art. § 9–745(e), which *replicates the routine appeal process from administrative agency decisions generally.* According to that modality, the circuit court reviews the Commission's action on the record and determines whether the Commission 1) acted within its power and 2) correctly construed the law and facts.

(Emphasis supplied).

*General Motors v. Bark*, 79 Md.App. at 73–74, 555 A.2d 542, similarly characterized this particular mode of appellate review:

> Thus far, the review contemplated seems to comprehend a review upon the record (or upon "[s]tipulations" or "a statement in lieu of a record") of the proceedings before the Commission. As such, *it would not differ from the ordi-*

---

apart from any notion that the Commission had "misconstrued the facts."

**5.** As will be discussed more fully *infra*, this was the key question on circuit court appeals from Commission decisions involving occupational disease between 1939 and 1983.

> *nary appeal from an administrative agency. The circuit court, in routinely appellate fashion, would scrutinize the action of the Commission for legal error, including the question of evidentiary insufficiency.*

(Emphasis supplied). In that opinion, we had earlier, 79 Md.App. at 71–72, 555 A.2d 542, pointed out a series of limitations that ordinarily attend such an administrative appeal.

> *Ordinarily,* under the "judicial review" provisions of the Administrative Procedure Act, Maryland Code, State Government Article, § 10–215(g)(3)(v), *the circuit court scrutinizes a decision of an administrative agency only for legal error. With respect to fact finding, the court may reverse* or modify an agency's decision *only if the "finding, conclusion, or decision of the agency ... is unsupported by* competent, material, and *substantial evidence* in light of the entire record as submitted." *Ordinarily, an appeal will be decided by the circuit court judge without a jury. Ordinarily, no additional evidence will be introduced upon the merits. Ordinarily, the role of the reviewing trial court with respect to an agency's fact finding is austerely limited.*

(Emphasis supplied).

This type of appeal from the Commission to the circuit court is sometimes referred to, by the caselaw and the academic commentators alike, as an appeal "on the record of the Commission." See Gilbert and Humphrey, *op. cit.* at 342. It is certainly a true characterization. On such an appeal, no new evidence is taken nor is any fresh fact-finding engaged in. The determination of whether the decision of the Commission was free from error will entail only an examination of the record of the proceedings before the Commission.

We nonetheless suggest that a cautionary red flag be raised whenever the words "on the record" are used. The phrase "on the record" can be a bit tricky because the very different appellate modality of *de novo* fact-finding, substantively the very antithesis of an appeal on the record, can in one of its evidentiary modalities also be said to be "on the record." One

of the permissible ways in which a judge or a jury may engage in *de novo* fact-finding is to read or have read to them the evidentiary record before the Commission. The *de novo* fact finder, be it judge or jury and with or without supplemental argument, is then free to reach its own fact-finding conclusion on the basis of that record. In a purely evidentiary sense, such *de novo* fact-finding might, therefore, be said to be "on the record." That is not what is meant, however, by the term of art "an appeal on the record."

"On the record," in its formal sense as denoting a type of appeal, means a review of the proceedings before the Commission, as a matter of law. By contrast, "on the record," in its lesser or evidentiary sense, refers simply to one, among many, of the sources of evidence for *de novo* fact-finding. Despite the truism that subterranean connotations may shift without disturbing a single surface syllable, it is still unnerving to be told that a type of appeal that is quintessentially not on the record may be decided on nothing more than a review of the record. Nonetheless, that is true. Our point is simply that the phrase, like nitroglycerine, should be handled with extreme care.

In any event, the appeal to the circuit court from the Commission in the case now before us was not of this variety.

## Option # 2:

## An Administrative Appeal Plus

The appellate option that was selected by the claimant in this case was what has historically been called an essential trial *de novo*. In language that is substantively unchanged since the prototype statute of 1914, § 9–745(d) provides:

(d) *Request for jury trial.*—On a motion of any party filed with the clerk of the court in accordance with the practice in civil cases, *the court shall submit to a jury any question of fact involved in the case.*

(Emphasis supplied). Because it is the "essential trial *de novo*" that is before us for examination in this case, it

behooves us to look closely at its various and sometimes perplexing procedural characteristics.

## A. The Birth of the Term "Trial *De Novo*" In Workers' Compensation Law

It is worthy of note that what is now so venerable an institution as the trial *de novo* in Workers' Compensation cases was never explicitly referred to in those terms by the statute that created it. Neither § 9–737, authorizing an appeal to the circuit court, nor § 9–745, laying out the ground rules for such an appeal, ever uses the term "*de novo.*" Credit for the characterization goes to Judge Hammond in *Richardson v. Home Mutual Life Ins. Co.*, 235 Md. 252, 255, 201 A.2d 340 (1964):

> Although *the statute* does not use the term, its directions *would seem to contemplate a trial which essentially is de novo.*

(Emphasis supplied).

As we pointed out in *General Motors v. Bark*, 79 Md.App. at 74, 555 A.2d 542, however, both the practice and its label are now firmly established.

> With 75 years of extensive case law behind it, however, the plenary availability of trial *de novo* at the circuit court level is not to be doubted, even if its statutory pedigree is more implicit than explicit.

## B. A Stark Contrast in Modes of Review

The most salient characteristic of the essential trial *de novo*, or "plus" option, is that it is diametrically different from the routine administrative appeal. *General Motors v. Bark*, 79 Md.App. at 73, 555 A.2d 542 ("*By way of dramatic contrast*, an appeal to the circuit court from a decision of the Workers' Compensation Commission is totally different. ... *[B]y way of significant departure* from the administrative agency norm, [§ 9–745(d)] ... goes on to provide *a vastly broader recourse* for the appellant in a Workers' Compensation case.") (Emphasis supplied); *Thomas v. Thompson*, 114 Md.App. at 364,

689 A.2d 1301 ("The other and *more unusual modality* is that spelled out by § 9–745(d), which provides for what is essentially a trial *de novo.*") (Emphasis supplied).

Whereas the standard administrative appeal probes only the question of legal error, the trial *de novo* is concerned only with findings of fact. Any language, therefore, about 1) the presumption of correctness of the Commission's decision or 2) the burden of proof's being upon the party attacking the Commission's decision is only pertinent when the issue on appeal to the circuit court is one of fact and not of law. Maurice J. Pressman, *Workmen's Compensation in Maryland* (1970), points out at § 4–25(1), p. 114:

> *The principle* that the decision of the Commission is prima facie correct and the burden of proof is upon the party attacking it *does not apply where the question involved is one of law, but only where the question is one of fact.*

(Emphasis supplied).

Judge Thompson was equally emphatic for this Court in *Symons v. R.D. Grier & Sons,* 10 Md.App. 498, 500, 271 A.2d 398 (1970):

> Appellant argues on appeal that the decision of the Commission is *prima facie* correct and the burden of proof is upon the party attacking it. *While the principle stated is true, it has no application where the question is one of law instead of fact.*

(Emphasis supplied).

The entitlement to fresh, *de novo* fact-finding is plenary and is not, as we have discussed, dependent in any way on the notion that the Commission's original fact-finding was in error. At the *de novo* trial, the propriety of the Commission's original fact-finding is a matter of no consequence. In this regard, we observed in *General Motors v. Bark,* 79 Md.App. at 76, 555 A.2d 542:

> The statutory direction to affirm an error-free Commission decision would not apply, however, to the alternative appeal mode of *de novo* trial. Indeed, *once the circuit court*

*embarks upon its de novo fact-finding mission, it is totally unconcerned with whether the Commission "correctly construed the law and facts" or not.*

(Emphasis supplied).

The opportunity for *de novo* fact-finding is both a broad form of relief and one that is by no means the norm. It was not carved into the granite of Mount Sinai that *de novo* fact-finding at the circuit court level is the inevitable or even the natural way of reviewing a decision of the Commission. Indeed, as Judge McWilliams pointed out for the Court of Appeals in *Smith v. State Roads Commission,* 240 Md. 525, 533, 214 A.2d 792 (1965), only 16 states other than Maryland authorize such *de novo* fact-finding. See also *Abell v. Goetze, Inc.,* 245 Md. 433, 437, 226 A.2d 253 (1967).

We offer one bit of Workers' Compensation Act history simply to illustrate this point. From 1914 through 1939, compensation was available only for accidents attributable to the claimant's employment. Chapter 465 of the Acts of 1939 then added, for the first time, occupational disease to the list of compensable disabilities. *Belschner v. Anchor Post Products,* 227 Md. 89, 92–93, 175 A.2d 419 (1961); *Montgomery County Police Dep't v. Jennings,* 49 Md.App. 246, 251–52, 431 A.2d 721 (1981). From 1939 through June 1, 1983, however, the broad *de novo* review of fact-finding that was available in accident cases was not permitted in cases of occupational disease. In *Montgomery Ward v. Bell,* 46 Md.App. 37, 42–43, 415 A.2d 636 (1980), Judge Wilner [6] outlined the austerely limited nature of the appeal to the circuit court in such a case.

Where the case involves an occupational disease, the court looks only to whether the Commission misconstrued the applicable law. Included *within that inquiry,* however, is *whether there was substantial (or legally sufficient) evi-*

---

6. We cannot help but admire the delicacy with which Judge Wilner (then of this Court but now of the Court of Appeals) pointed out how the Court of Appeals on an earlier occasion had been wrong.

The second (italicized) sentence of this passage, we deign to suggest, does appear to be a bit misleading.

*dence* to support the Commission's factual conclusions, *that being,* in essence, *an issue of law rather than of fact.*

. . . .

. . . [T]he only ground of reversal on the *facts,* in such a case, is where there is a legal insufficiency of evidence to support the Commission's factual conclusions. This has to do with the *quantum* of evidence before the Commission, however, not with the Commission's "construction" of that evidence. Conversely, it would seem clear that, *in an accidental injury case, the scope of judicial review is broader than merely determining "an erroneous construction of the law or facts."*

(Emphasis supplied). See also *Maryland Bureau of Mines v. Powers,* 258 Md. 379, 265 A.2d 860 (1970); *Big Savage Refractories Corp. v. Geary,* 209 Md. 362, 369, 121 A.2d 212 (1956); *Armco Steel Corp. v. Trafton,* 35 Md.App. 658, 661–62, 371 A.2d 1128 (1977).

As Judge Bell (now Chief Judge of the Court of Appeals) observed for this Court in *Glidden–Durkee v. Mobay Chemical Corp.,* 61 Md.App. 583, 596–98, 487 A.2d 1196 (1985), however, that difference in appellate approaches was eliminated by Chapter 521 of the Acts of 1982, effective June 1, 1983, and occupational disease cases now enjoy *de novo* review as fully as do accident cases.

With the abolition of the Medical Board and, particularly, the deletion of the limitations on review of occupational disease cases, *the differentiation heretofore made between occupational disease cases and accidental injury cases no longer exists and cannot be justified.*

61 Md.App. at 597, 487 A.2d 1196 (emphasis supplied). See also *Turner v. Office of the Public Defender,* 61 Md.App. 393, 398–401, 486 A.2d 804 (1985). Our point is that this appellate mode of providing for broad *de novo* review of contested facts is by no means something to be routinely taken for granted.

In this case, the claimant availed herself of the "administrative appeal plus" option of what was essentially a trial *de novo* before the Circuit Court for Montgomery County.

## C. Either Party May Request *De Novo* Fact–Finding

Either party on the appeal to the circuit court may invoke the right to have a factual finding by the Commission determined *de novo* at the circuit court level. Section 9–745(d) expressly provides that "the court shall, *upon the motion of either party* . . ., submit to a jury any question of fact involved in such case." (Emphasis supplied). Pressman, *op. cit.*, points out at § 4–16, p. 168:

> If the Commission finds for a claimant on some issues, but disallows the claim, *the employer and insurer are not precluded, on an appeal by the claimant, from raising the questions decided by the Commission in favor of the claimant,* and it is not necessary for the employer and insurer to file a cross-appeal to do so.

(Emphasis supplied). Pressman further observes, at § 4–22, p. 171:

> Even though a party does not appeal, he can raise issues contesting the findings and decision of the Commission in an appeal taken by the other party.

See *Richardson v. Home Mutual Life Ins. Co.*, 235 Md. at 255, 201 A.2d 340.

We cannot help but note in this regard the spectre of a problem which, to the best of our knowledge, has never yet materialized in the reported cases but nonetheless hovers in the ether. By an unspoken assumption, the party requesting *de novo* fact-finding has always had the choice of weapons—*de novo* fact-finding 1) by a jury or 2) by a judge sitting as a jury. The requesting party has also always had a free hand in deciding whether the *de novo* fact-finding (by judge or jury) shall be 1) on the basis of the record before the Commission alone (by reading it or having it read to them); 2) by live witnesses and fresh evidence alone; or 3) by a combination of the two.

That is fine, so far as it goes; but what if both parties

request *de novo* fact-finding [7]—on different issues or on the same issue? No problem so far, but what if one requests a *de novo* trial by a jury and the other requests a *de novo* trial by the judge without a jury? What if one requests *de novo* review on the basis of the record before the Commission and the other requests live witnesses, including additional witnesses? Mercifully, no such issue is before us in this case, and we can offer only our considered opinion that, when it arises, it will be an interesting question.[8]

In this case, it was the claimant alone who invoked *de novo* fact-finding and the claimant alone, therefore, who had the choice of procedural weapons.

### D. A Threshold Requirement for *De Novo* Review

■ Before *de novo* fact-finding may be engaged ·in at the circuit court level, however, there is a threshold requirement that must be satisfied. Any factual question that is to be the subject of *de novo* relitigation must first have been a factual issue that was actually decided by the Commission. In *Cabell Concrete Block Co. v. Yarborough,* 192 Md. 360, 369, 64 A.2d 292 (1949), the Court of Appeals was very emphatic in this regard.

As the Commission is the original fact-finding body, *an issue of fact must originate with the Commission, and*

---

**7.** Hypothesize a finding by the Commission that a claimant had suffered a temporary partial disability followed by an award of compensation for 50 weeks. The claimant believes this to be too little and seeks *de novo* review. The employer believes this to be too much and also seeks *de novo* review. It would appear that each would be the moving party with respect to its particular issue and that each would bear the burden of persuading the *de novo* fact finder that the presumption of correctness of the Commission's decision was overcome in the way urged by that particular party.

**8.** Although the trial judge might need a scorecard to keep up with the proceedings, there would appear to be no compelling reason why each party should not enjoy procedural autonomy with respect to the *de novo* issues raised by that party. In any event, this type of scenario, grist for the mill of law school professors, will be exceedingly rare, and it may be enough to fashion an *ad hoc* solution when, if ever, such a scenario presents itself.

*cannot be raised for the first time before the Court on appeal,* for in such a case the Court is authorized only to modify or reverse the decision of the Commission upon a finding that it has erred in construing the law or the facts. *Bethlehem Steel Co. v. Mayo,* 168 Md. 410, 416, 177 A. 910. However, the rule that no issue of fact can be submitted on appeal where the record does not show that the question involved was before the Commission does not mean that a formal issue, specifically directed to the question, must be presented first to the Commission, but means merely that *there must have been at least evidence before the Commission which would give it the opportunity to pass upon the question.*

(Emphasis supplied). See also *Richardson v. Home Mutual,* 235 Md. at 255, 201 A.2d 340; *Jackson v. Bethlehem–Sparrows Point Shipyard, Inc.,* 189 Md. 583, 589, 56 A.2d 702 (1948); *Benoni v. Bethlehem–Fairfield Shipyard, Inc.,* 188 Md. 306, 309, 52 A.2d 613 (1947); *Oxford Cabinet Co. v. Parks,* 179 Md. 680, 683, 22 A.2d 481 (1941); *Hathcock v. Loftin,* 179 Md. 676, 678, 22 A.2d 479 (1941); *Altman v. Safeway Stores, Inc.,* 52 Md.App. 564, 566–67, 451 A.2d 156 (1982), *aff'd,* 296 Md. 486, 463 A.2d 829 (1983); *Trojan Boat Co. v. Bolton,* 11 Md.App. 665, 670, 276 A.2d 413 (1971).

*General Motors v. Bark,* 79 Md.App. at 74, 555 A.2d 542, also spoke to this gatehouse requirement.

There is ... provided ... the prerogative of a trial *de novo* at the circuit court level of *any or all of the factual issues initially determined by the Commission.*

(Emphasis supplied). Pressman, *op. cit.,* at § 4–22, pp. 170–71, also points out:

On an appeal from the Commission, the trial is de novo, *but only on the questions of fact submitted to the Commission* by way of some evidence or by a formal issue.

(Emphasis in original).

In this case, that threshold requirement was satisfied in that the factual issue for *de novo* determination—"Did the claimant suffer an accidental injury in the course of and arising out of

her employment?"—was the precise factual issue that had been decided by the Commission.

## E. Both Judges and Juries May Be *De Novo* Fact Finders

■ Although § 9–745(d) speaks only of submitting "to a jury any question of fact involved in the case," it is now well settled that factual issues may just as readily be submitted to a judge, sitting without a jury. *Coastwise Shipbuilding Co. v. Tolson*, 132 Md. 203, 103 A. 478 (1918), was decided just four years after the first enactment of what is now our Workers' Compensation Law. An employee filed a claim with the State Industrial Accident Commission for an accidental injury, and the Commission made an award to the employee. The employer appealed to the circuit court. Notwithstanding the fact that the statute authorizing the appeal to the circuit court spoke only of submitting "to a jury any question of fact involved in the case," the factual dispute in *Coastwise* was submitted to "the Court sitting as a jury." 132 Md. at 205, 103 A. 478. The fact-finding judge affirmed the Commission, and the Court of Appeals, in turn, affirmed. It analogized the case to *Jewel Tea Company v. Weber*, 132 Md. 178, 103 A. 476 (1918), recognizing a *de novo* jury's entitlement to decide a disputed fact and held that a *de novo* fact-finding judge, sitting as a jury, enjoyed exactly the same prerogative.

> *The fact that* we were there [in *Jewel Tea*] dealing with a case which was tried with the aid of a jury, and in *the case at bar was tried without the aid of a jury, causes no difference* in the principles above announced. It has long been established that, *in trying a case before the Court, sitting as a Court and jury, the same rule of law is applicable* to the prayers, upon the question of their rejection, *as would be if the case were being tried before a jury.*

132 Md. at 208, 103 A. 478 (emphasis supplied).

Chief Judge Brune again placed the imprimatur of the Court of Appeals on having a judge as the *de novo* fact finder in *L. & S. Construction Co. v. State Accident Fund*, 221 Md. 51, 60, 155 A.2d 653 (1959), overturned on other grounds by

*Whitehead v. Safway Steel Products, Inc.,* 304 Md. 67, 497 A.2d 803 (1985). In *L. & S. Construction,* the Commission had made an award to the claimant and the employer appealed. The appeal, on the disputed question of fact as to which of two parties was the actual employer, was heard by the circuit court judge "sitting without a jury." 221 Md. at 54, 155 A.2d 653. The Court of Appeals agreed that there was a genuine dispute to be resolved by the fact-finding judge.

> Though there is no dispute as to the basic facts here, there is a dispute as to the ultimate and decisive inferences to be drawn therefrom.

221 Md. at 60, 155 A.2d 653. Judge Brune put the general seal of approval on the judge, sitting without a jury, as the *de novo* fact finder.

> The instant case was tried before the court without a jury, but *disputed questions of fact which would have been for the determination of the jury are to be determined by the judge as questions of fact,* not as questions of law.

221 Md. at 60, 155 A.2d 653 (emphasis supplied). The *de novo* judge's fact-finding was supported by the evidence and was, therefore, affirmed.

> *Judge Marbury was the trier of the facts in this case.* We think that the undisputed facts and the inferences reasonably to be drawn therefrom were sufficient to support his finding that L & S was the sole employer of Addison under the rules of law above stated.

221 Md. at 61, 155 A.2d 653 (emphasis supplied).

In *Abell v. Albert F. Goetze, Inc.,* 245 Md. 433, 226 A.2d 253 (1967), the Commission had initially made an award to the claimant. On a disputed question of fact, the employer took a *de novo* appeal to the circuit court judge sitting without a jury. On the evidence before him, the judge reversed the decision of the Commission.

> The lower court, sitting without a jury, found as a fact that appellant "did not receive an injury on the 4th of February *in the course of his employment,* * * *." The judge in the court below relied on the testimony of nurse McBride, the stipulation as to Dr. McElwain's testimony

had he been called as a witness, and the fact that on February 29, 1964, appellant filed a written claim with the Commission concerning the previous hand injury without making claim for the alleged knee injury of February 4, 1964.

245 Md. at 436, 226 A.2d 253 (emphasis supplied). The Court of Appeals fully approved the role of the judge as a fact finder.

In the instant case *the court below, as the trier of facts, had the opportunity to hear the testimony of the witnesses and observe their demeanor.* That great weight was given to the credibility of the witnesses was obvious from the language employed in the oral opinion of the court.

245 Md. at 438, 226 A.2d 253 (emphasis supplied). In the last analysis, that judicial fact-finding was not clearly erroneous and was, therefore, affirmed.

*We certainly cannot say Judge Powers' finding,* that the appellant did not receive an injury on the 4th of February in the course of his employment, *was clearly in error and we so hold.*

245 Md. at 439, 226 A.2d 253 (emphasis supplied).

This Court has regularly recognized the role of the trial judge, sitting without a jury, as a *de novo* fact finder. *Dent v. Cahill,* 18 Md.App. 117, 125, 305 A.2d 233 (1973) ("Not only may trial courts, on appeal from decisions of the Commission, decide whether the Commission misconstrued the facts, but they may also decide how the facts should have been construed."); *Turner v. Office of the Public Defender,* 61 Md.App. 393, 405, 486 A.2d 804 (1985) ("To reverse a judgment of a court in a non-jury trial we must be convinced that the judge's factual findings were clearly erroneous.").

In *Egypt Farms v. Lepley,* 49 Md.App. 171, 176, 430 A.2d 122 (1981), Judge Wilner, for this Court, analyzed the broad fact-finding prerogative enjoyed by a judge, as well as by a jury, on *de novo* review of a decision by the Commission.

[T]he reviewing court has very broad authority, notwithstanding the *prima facie* correctness of the administrative decision. *This review,* said the Court in *Maryland Bureau of Mines v. Powers,* 258 Md. 379, 382, 265 A.2d 860 (1970),

"extends both to findings of fact and applicable law" and *"provides for a trial which is essentially de novo." The court (or jury),* in other words, *is not so bound by the Commission's fact findings* as is normally the case in administrative appeals, *but is free to weigh the evidence* (and the inferences from it) *and reach entirely opposite conclusions.*

(Emphasis supplied).

To this unbroken line of authority, *General Motors v. Bark,* 79 Md.App. at 78, 555 A.2d 542, simply added, "Amen." Upon such trial *de novo, it is now well settled that factual issues may be submitted to a judge, sitting without a jury, as readily as to a jury.* This is so *notwithstanding the fact that Section 56* itself *speaks only of "submit[ting] to a jury any question of fact involved in such case."*

(Emphasis supplied).

The academic authorities are in solid accord. Gilbert and Humphreys, *op. cit.,* observes, at § 17.4, p. 342.

The practice is that appeals are presented to trial courts in one of two fashions: (1) the submission of the case to the judge on the basis of the record made before the Commission; or (2) *a de novo evidentiary hearing before the court sitting with or without a jury.*

(Emphasis supplied). At § 17.4–2, p. 343, the same authority further notes:

*What we have said* pertaining to trial on appeal on the basis of the record before the Commission *is largely true if there is a full jury or nonjury trial on appeal.* The only difference is that the case is tried *de novo* before the judge, if it be heard nonjury, or before the judge and jury in the event a jury trial is requested.

*The jury or the judge,* as the case may be, *is free to interpret the facts* as if the Commission had not previously determined them.

(Emphasis supplied).

Pressman, *op. cit.,* at § 4–9(7), pp. 156–57, implicitly recognized the trial *de novo* before the court alone, as it contrasted

certain practices there applicable from practices that apply when the *de novo* fact finder is a jury.

It is not essential to frame issues of fact if a jury trial is waived and the case is tried before the Court sitting as a jury. *Townsend v. Bethlehem–Fairfield Shipyard,* 186 Md. 406, 47 A.2d 365 (1946); *Liberty Mut. Ins. Co. v. United States Fid. & Guar. Co.,* 164 Md. 117, 164 A. 179 (1933); *L. & S. Constr. Co. v. State Accident Fund,* 221 Md. 51, 155 A.2d 653 (1959). A motion for a directed verdict is not proper in a non-jury appeal under Rule 535, *Smith v. State Roads Comm'n,* 240 Md. 525, 214 A.2d 792 (1965).

However dubious the rationale behind the judge, sitting without a jury, as an alternative modality for *de novo* fact-finding, it is now late in the day to doubt the acceptance of a procedure that, albeit perhaps never squarely challenged, has been regularly employed and regularly approved since *Coastwise Shipbuilding v. Tolson* in 1918.

In this case, the claimant selected as the *de novo* fact finder Judge Rowan, sitting without a jury, and the procedure was not challenged.

### F. The Multiple Sources for *De Novo* Fact–Finding

In *Abell v. Goetze, Inc.,* 245 Md. at 436–37, 226 A.2d 253, Judge Finan made it clear that there is wide latitude in selecting the evidence to be placed before the *de novo* fact finder.

The burden is upon the appellant to overcome the presumption that the decision of the Commission is prima facie correct, and he must do this to the satisfaction of the trier of the facts. *This can be done by submitting new evidence, by relying on all or a part of the record before the Commission, by argument as to the probative value of the evidence and by argument as to the credibility of witnesses. All of these matters are legitimate elements of a trial de novo*

which counsel may exercise to the fullest legitimate means to overcome the existing presumption.

(Emphasis supplied).

Pressman, *op. cit.*, § 4–23(2) at p. 172, also refers to this variety of evidentiary sources.

*A party may read to the jury the testimony of any or all witnesses* who testified before the Commission, *or have them testify in person,* or *read the testimony of some witnesses and have others appear* in person, or rely entirely on the Record.

(Emphasis supplied).

In *General Motors v. Bark*, 79 Md.App. at 81, 555 A.2d 542, we also noted the variety of predicates for *de novo* fact-finding.

*Relying upon the Commission record alone, relying upon that record as supplemented by live testimony,* or *relying entirely upon new evidence* are all equally legitimate ways of proceeding upon appeal at the circuit court level.

(Emphasis supplied). See also *Applied Industrial Technologies v. Ludemann*, 148 Md.App. at 282, 811 A.2d 845 ("At trial, the parties may rely on the same or different evidence than was presented to the Commission."); *Keystone Masonry Corp. v. Hernandez*, 156 Md.App. 496, 505, 847 A.2d 493 (2004).

## 1. Looking at the Prior Record Alone

■ The party requesting *de novo* fact-finding at the circuit court may choose to rely exclusively on the testimonial record before the Commission. The presumption that the Commission's decision was correct will not preclude a party from persuading the *de novo* fact finder to reach a completely opposite conclusion even on identically the same record. In *Williams Construction Co. v. Bohlen*, 189 Md. 576, 580, 56 A.2d 694 (1948), Judge Delaplaine dealt squarely with this issue.

*It was urged here that the evidence in the trial court was substantially the same as the evidence before the Commission, and that claimant failed to meet the burden cast upon*

*him by law to prove that the decision of the Commission was incorrect.* The Maryland Workmen's Compensation Act provides that in all Court proceedings under or pursuant to this Act, the decision of the Commission shall be *prima facie* correct and the burden of proof shall be upon the party attacking the same. We hold, however, that where the Commission has considered conflicting evidence of essential facts, and has drawn one of two different permissible inferences, *there may be imposed upon the party attacking the decision of the Commission merely a burden of persuasion, and not necessarily a burden of additional proof. He may rely upon identically the same evidence that was presented before the Commission.* The provision of the Act placing the burden of proof upon the appellant means only that he must prove in the trial Court what he asserts.

(Emphasis supplied). *See Greenwalt v. Brauns Building Specialties Corp.,* 203 Md. 313, 317, 100 A.2d 804 (1953) ("At the trial of the case in the Baltimore City Court, the testimony taken before the Commission was read from the record to the jury."). *See also Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 140–41, 265 A.2d 256 (1970); *Blake Construction Co. v. Wells,* 245 Md. 282, 287, 225 A.2d 857 (1967); *Sica v. Retail Credit Co.,* 245 Md. 606, 612, 227 A.2d 33 (1967); *Savage Manufacturing Co. v. Magne,* 154 Md. 46, 50–53, 139 A. 570 (1927); *Kelly v. Baltimore County,* 161 Md.App. 128, 867 A.2d 355, 2005 WL 195549 (2005).

Indeed, *Stewart v. Howell,* 136 Md. 423, 433–34, 110 A. 899 (1920), pointed out that so long as the moving party, with legally sufficient evidence, carries the burden of persuading the *de novo* fact finder, he may do so with even less evidence than that which had failed to persuade the Commission.

As we understand, Section 56 of the Workmen's Compensation Law (Code, Art. 101, Sec.56), *it does not mean that there must be additional testimony offered on appeal from the Commission; or that even as much testimony need be offered by the party taking the appeal as he produced before*

*the Commission* in order to discharge the burden put upon him by that section.

(Emphasis supplied).

Given a genuine factual dispute that could legitimately be resolved by different fact finders in different ways, the *de novo* fact finder could well be persuaded by evidence that had failed utterly to persuade the Commission. Where different inferences might be drawn from precisely the same evidence, the *de novo* fact finder could legitimately draw one and the *de novo* fact finder, another. *City of Salisbury v. Parks,* 57 Md.App. 295, 298, 469 A.2d 1275 (1984); *City of Salisbury v. McCoy,* 47 Md.App. 488, 497, 424 A.2d 164 (1981). This was precisely the situation before this Court in *General Motors v. Bark,* 79 Md.App. at 81, 555 A.2d 542:

> In attacking the decision of the Commission and in seeking to overcome its *prima facie* correctness, General Motors relied primarily on the record made before the Commission. It called one live witness, the claimant himself, whose testimony largely tracked his testimony before the Commission. *Even in looking at essentially indistinguishable testimony,* however, *the Commission, as was its prerogative, gave great credit to the claimant's testimony, whereas Judge Hammerman, as was his prerogative, gave it little or no credit.*

(Emphasis supplied).

### 2. The Prior Record Through the Lens of Fresh Argument

Even where the trial *de novo* proceeds exclusively on the record before the Commission, counsel may argue the evidence afresh and may succeed in being persuasive before the circuit court even if he or she had failed in that regard before the Commission. The very opposite, of course, may also occur.

Indeed, between 1931 and 1935 the *de novo* review of the decision of the Commission was narrowly limited to examining the transcript of the hearing before the Commission and no

additional testimony was allowed. Although prior to 1931 the *de novo* review had been as broad as it is today, Chapter 406 of the Acts of 1931 strictly limited the review to an examination of the transcript of proceedings before the Commission. *Thomas v. Pennsylvania R.R.*, 162 Md. 509, 160 A. 793 (1932); *Waddell George's Creek Coal Co. v. Chisholm*, 163 Md. 49, 51–53, 161 A. 276 (1932); *Moller Motor Car Co. v. Unger*, 166 Md. 198, 204–05, 170 A. 777 (1934). Chapter 545 of the Acts of 1935, however, repealed that limitation on the production of *de novo* evidence. *Baltimore City Council v. Perticone*, 171 Md. 268, 273, 188 A. 797 (1937), explained:

> [C]hapter 545 of *the Acts of 1935*, amending and reenacting section 56 of article 101, no longer required the court on appeal to confine its consideration of the case to the record made before the commission, and in this respect *restored article 56 to the status it occupied prior to* its amendment by chapter 406 of *the Acts of 1931. The effect* of this legislation *was to restore to litigants the right on appeal to have some witnesses give oral testimony* and introduce the testimony of others by reading from the transcript made before the commission, which right they enjoyed prior to the 1931 amendment.

(Emphasis supplied). And see Pressman, *op. cit.*, § 4–23(3), p. 173.

### 3. Live Witnesses, Old and New

■ There is now no requirement that the *de novo* fact finder consider the record before the Commission. That record is simply one possible evidentiary source, among many, as *Harvey v. Roche and Son*, 148 Md. 363, 366, 129 A. 359 (1925), made starkly clear.

In section 56 of the act, concerning proceedings on appeal, *there is no requirement that the transcript of testimony taken before the commission shall be read to the jury;* there is no mention of that testimony. The act evidently contemplates that the case may be presented to the court, without a jury, upon the proceedings and *testimony taken before the commission. But nothing in it requires that the record of*

*those proceedings and that testimony be submitted to the jury when a jury trial is had on the facts. The jury trial* provided for *would seem to be,* not a review of the decision of the commission, but an *original trial on the questions of fact submitted,* in which the evidence is to be presented as in any other jury trial.

(Emphasis supplied).

■ There may be offered before the *de novo* fact finder not only the live witnesses who had testified before the Commission, but additional, or simply other, witnesses who had not. *Frazier v. Leas,* 127 Md. 572, 576, 96 A. 764 (1916), was emphatic on this point.

*Trial by jury implies the right of either party to the cause to call witnesses to support his case.* The granting to one a right of trial by jury, and then to deny him the right to introduce witnesses in support of his case would be like the play of "Hamlet" with Hamlet left out. We have never heard of a case in which this right was denied, and we do not suppose the Legislature intended to introduce such a novel procedure.

(Emphasis supplied). *Meyler v. Baltimore City Council,* 179 Md. 211, 219, 17 A.2d 762 (1941), spoke to the same effect.

The testimony *at a trial on an appeal* from the State Industrial Accident Commission is not confined to the testimony taken before the commission, but *each side has the right to call its witnesses to support its case.*

(Emphasis supplied). And see *Miller v. James McGraw Co.,* 184 Md. 529, 542–43, 42 A.2d 237 (1945); *City of Salisbury v. Parks,* 57 Md.App. at 298, 469 A.2d 1275.

In this case, four witnesses testified before Judge Rowan, whereas only two had testified before the Commission.

### G. Why the Qualifier "Essentially"?

When Judge Hammond, in 1964, first described the procedure of "submit[ting] to a jury any question of fact involved in the case" in terms of a trial *de novo,* he, quite rightly, qualified the description, stating that "the statute . . . would seem to

contemplate a trial which *essentially* is *de novo*." *Richardson
v. Home Mutual*, 235 Md. at 255, 201 A.2d 340. Without
further elaboration, however, that characterization remained a
trifle cryptic. Cryptic or not, the phrase had legs and was
religiously intoned, as what amounted to a standing epithet,
over the decades that followed. *Smith v. State Roads Com-
mission*, 240 Md. 525, 533, 214 A.2d 792 (1965); *Abell v.
Goetze, Inc.*, 245 Md. 433, 437, 226 A.2d 253 (1967); *Maryland
Bureau of Mines v. Powers*, 258 Md. 379, 382, 265 A.2d 860
(1970); *Holman v. Kelly Catering*, 334 Md. 480, 484, 639 A.2d
701 (1994); *Chadderton v. M.A. Bongivonni, Inc.*, 101 Md.
App. 472, 478, 647 A.2d 137 (1994); *American Airlines v.
Stokes*, 120 Md.App. 350, 353, 707 A.2d 412 (1998). In *General
Motors v. Bark* in 1989, we finally asked what seems as if it
should have been an obvious question all along.

> The inquiring mind will immediately demand to know the
> significance of the qualifier "essentially." What is the dif-
> ference between an essential trial *de novo* and a true trial
> *de novo?*

79 Md.App. at 79, 555 A.2d 542.

■ A true trial *de novo*, of course, would put all parties
back at "square one," to begin again before the circuit court
just as if the adjudication appealed from had never occurred.
In what is "essentially a trial *de novo*," by contrast, that is by
no means the case. The past is not erased, but may serve as
prologue to the upcoming result in no less than four respects.
The decision of the Commission, far from being relegated to
the archives, 1) may be offered as substantive evidence before
the *de novo* fact finder; 2) may be the subject of a jury
instruction at the *de novo* trial; 3) may, if necessary, satisfy
the burden of initial production at the *de novo* trial; and 4)
will sometimes shift the allocation of the burdens of proof
(both production and persuasion) at the *de novo* trial.

The reason for these differences between an essential trial
*de novo* and a true trial *de novo* is to be found in the
provisions of § 9–745(b):

> (b) *Presumption and burden of proof.*—In each court
> proceeding under this title:

(1) the decision of the Commission is presumed to be prima facie correct; and

(2) the party challenging the decision has the burden of proof.

### H. The Limited Function of the *De Novo* Jury

Another characteristic of the essential trial *de novo* that distinguishes it from a true trial *de novo* is the nature of the questions submitted to a *de novo* jury. Just six years after the statutory prototype of the Workers' Compensation Act first went into effect, *Schiller v. Baltimore & Ohio Railroad Co.,* 137 Md. 235, 242, 112 A. 272 (1920), framed the issue.

*[W]e are still left in doubt as to* whether the right given to have "any question of fact" submitted to a jury, means simply *the right to the ordinary jury trial, or* whether it means *the right to have special issues submitted.*

(Emphasis supplied).

The Court of Appeals in *Schiller* concluded that the *de novo* jury does not, as might an ordinary jury, render an ultimate verdict but only makes specific findings of fact on specific issues that are carefully framed and submitted to it.

It seems clear ... that it is not within the powers of the jury on such an appeal to find a verdict for any amount or to fix the rate or period of compensation or to make any award. It may however find the facts upon which the court determines whether the finding of the commission shall be confirmed, reversed, or modified.... The provision as to the right of either party to have any question of fact submitted to a jury, following the language above quoted, would seem to be intended to protect the constitutional right to a jury trial of the facts involved, but in such a way as to enable the court to apply the law to the facts after they are found by the jury.

*Id.*

The Court of Appeals analogized the practice to the prevailing practice when cases are sent to the circuit court from the Orphans' Court.

For the practical working of such a scheme there does not seem to be any method so appropriate as *the submission of issues in a manner analogous to the practice in cases sent from the Orphans' Court* or from courts of equity, where it is desired that a jury shall pass on the facts.

137 Md. at 243, 112 A. 272 (emphasis supplied). See *Morris v. Christopher*, 255 Md. 372, 258 A.2d 172 (1969); *Arundel Corp. v. Plater*, 236 Md. 322, 203 A.2d 895 (1964); *Miller v. James McGraw Co.*, 184 Md. 529, 42 A.2d 237 (1945); *Bethlehem Shipbuilding Corp. v. Simmons*, 143 Md. 506, 122 A. 678 (1923).

The *Schiller* opinion finally cautioned that the issues submitted should be "ultimate issues" and not issues with respect to "every subordinate fact."

*It does not follow that the trial court is bound to submit as an issue every subordinate fact.* That would only cause confusion. *The facts submitted as issues should*, as far as practicable, *be confined to the ultimate issues* involved in the finding of the Commission from which the appeal is taken, such as disability, dependency, whether the injury arose out of and in the course of employment, and the like, according to the ultimate fact or facts to be determined.

137 Md. at 244, 112 A. 272 (emphasis supplied).

On the other hand, a judge, sitting *de novo* without a jury, is not confined within the fact-finding format of formal and specific issues. *Townsend v. Bethlehem–Fairfield Shipyard, Inc.*, 186 Md. 406, 47 A.2d 365 (1946); *Liberty Mutual Insurance Co. v. United States Fidelity & Guarantee Co.*, 164 Md. 117, 164 A. 179 (1933).

Because the essential *de novo* trial in the present case was not before a jury but before Judge Rowan alone, it is unnecessary to explore further this differentiating characteristic.

## I. The Evidentiary Consequences of the Presumption of Correctness

The fact that the decision of the Commission on an issue of fact is presumed to have been correct is relevant

evidence at the trial *de novo* as proof of the very proposition that was so decided by the Commission. In *Kelly Catering v. Holman,* 96 Md.App. 256, 271, 624 A.2d 1300 (1993), Judge Alpert reasoned for this Court:

> It is pellucid that *the [Commission's] resolution of that very issue is both material* (because it is of legal consequence to the determination of the issue) *and relevant* (because it tends to make the existence of a material fact, *i.e.,* Holman's status as an independent contractor, more probable than it would be without the evidence; it is, of course, beyond dispute—and therefore rarely stated—that the [Commission] possesses considerable expertise in interpreting and applying the Workers' Compensation statutes, and accordingly *the [Commission's] finding of a particular fact makes the existence of that fact more probable than had the [Commission] not so found said fact).*

(Emphasis supplied).

In affirming that aspect of Judge Alpert's decision, Judge Chasanow further reasoned for the Court of Appeals in *Holman v. Kelly Catering,* 334 Md. at 486–87, 639 A.2d 701:

> In order to effectuate the legislature's mandate that the Commission's "decision ... is presumed to be prima facie correct," *the jury should know what decision is presumed correct and who made that decision. See Kelly Catering,* 96 Md.App. at 272, 624 A.2d at 1308 ("[I]t seems clear enough from the language of § 9–745, *inter alia,* that the legislature wanted the finder of fact *to be aware* that the presumption [that Holman is an independent contractor] resulted from the Commission's decision.") *Alexander v. Montgomery County* (writing for the intermediate appellate court, Judge Robert M. Bell reasoned that, *"because [the Commission's decision] is presumed correct, that decision had to be presented to the jury"). In addition, if the jurors are told that the decision is prima facie correct, they obviously will consider it in weighing whether the party challenging the Commission's decision has met its burden of proof* by a preponderance of the evidence.

(Emphasis supplied). See *Alexander v. Montgomery County,* 87 Md.App. 275, 286–87, 589 A.2d 563 (1991).

On the closely related subject of instructing the *de novo* jury as to the significance of such a presumptively correct decision by the Commission, Judge Alpert further stated:

*[A] judge has the duty to instruct a jury as to the proceedings of the Commission below, and of the presumption of correctness accorded to the Commission's decision.* On the other hand, we also hold that the right to a trial *de novo* is, by our decision today, absolutely preserved. In implementing these two holdings, *trial judges, in instructing juries, must carefully avoid suggesting that the Commission's decision is binding upon the finder of fact. It is not.* The Commission's decision is merely *evidence* of a particular fact (or facts) which, as with all evidence, the jury is free to disregard if it finds it to be incredible.

96 Md.App. at 275, 624 A.2d 1300 (emphasis supplied). The opinion squarely placed its imprimatur on Maryland Civil Pattern Jury Instruction 30:3, which states in pertinent part:

This case has been heard and decided by the [Workers'] Compensation Commission. The [employee is] appealing the decision of the Commission.

*The Commission determined* that [Holman is an independent contractor]. *This decision is presumed to be correct. The [employee has] the burden of proving by a preponderance of the evidence that the decision is wrong.* In meeting this burden the [employee] may rely on the same, less or more evidence than was presented to the Commission.

96 Md.App. at 274, 624 A.2d 1300 (emphasis supplied).

On that consequence of the presumption of correctness, the Court of Appeals also affirmed, citing a long history of cases approving such a jury instruction and concluding, 334 Md. at 493, 639 A.2d 701:

Maryland case law demonstrates that the commonly accepted understanding of § 9–745(b) is that *jury instructions should refer to the fact that the Commission rendered a*

*prior decision, and that such a decision is prima facie correct.*

(Emphasis supplied). See *Coastwise Shipbuilding Co. v. Tolson,* 132 Md. 203, 206, 103 A. 478 (1918); *Larkin v. Smith,* 183 Md. 274, 278, 37 A.2d 340 (1944).

As to these two evidentiary consequences that distinguish an essential trial *de novo* from a true trial *de novo,* this Court observed in *Thomas v. Thompson,* 114 Md.App. at 366, 689 A.2d 1301:

> [O]ne difference between a true trial *de novo* and an essential trial *de novo* is that in the latter, one does not treat the adjudication appealed from as if it had never occurred. It is, rather, the case that *the presumptively correct outcome of that adjudication is admissible as an item of evidence and is the proper subject of a jury instruction. It is an evidentiary fact* that may well tip the scales of persuasion.

(Emphasis supplied).

As we summed up the evidentiary consequences in *American Airlines v. Stokes,* 120 Md.App. at 360, 707 A.2d 412:

> On appeal to the circuit court, the prior decision of the Workers' Compensation Commission is treated as being presumptively correct. One of the procedural incidents of such a presumption is that *the fact finder* at the circuit court level *will be informed of the earlier decision and of its presumptive correctness* and will be entitled to give it evidentiary significance.

(Emphasis supplied). See also *Applied Industrial Technologies v. Ludemann,* 148 Md.App. at 283, 811 A.2d 845; *Kelly v. Baltimore County,* 161 Md.App. at 138, 867 A.2d 355.

In this case, there was no problem with respect to jury instructions because there was no jury involved. As evidence, the decision of the Commission and its presumptive correctness were indisputably before Judge Rowan and were expressly acknowledged by him.

> While *the Court acknowledges that the Maryland Worker's Compensation Commission found in favor of the Employer,*

that finding is a rebuttable presumption. The Court finds that the Claimant has carried the burden of proof by a preponderance of the evidence that the decision by the Maryland Worker's Compensation Commission was error. (Emphasis supplied).

## J. The Procedural Consequences of the Presumption of Correctness

Just as § 9–745(b)'s presumption that "the decision of the Commission is presumed to be prima facie correct" produces two closely related evidentiary consequences, it also produces two closely related procedural consequences. As the case moves from the Commission to the circuit court, there may be, although there need not necessarily be, a shift in the allocation of the burdens of proof (both production and persuasion). The claimant, of course, was the original moving party. It was the claimant's initial burden 1) to produce a legally sufficient case to permit the Commission, as a matter of law, to find in his favor and 2) to persuade the Commission, as a matter of fact, to do so.

If it is the claimant who loses before the Commission and who seeks a trial *de novo* at the circuit court, his burdens before the circuit court remain unchanged from his earlier burdens before the Commission. He must again produce a legally sufficient case, as a matter of law, even to permit the case to go to the *de novo* fact finder, lest he suffer a summary judgment or directed verdict against him. *American Airlines v. Stokes*, 120 Md.App. at 353, 707 A.2d 412; *Kelly v. Baltimore County*, 161 Md.App. at 135, 867 A.2d 355. He must then, as a matter of fact, persuade the *de novo* fact finder to find in his favor. On the way from the Commission to the circuit court, nothing will have changed. As we explained in *General Motors v. Bark*, 79 Md.App. at 79–80, 555 A.2d 542:

> If the claimant loses before the Commission and then appeals to the circuit court, the provision, as a practical matter, is largely meaningless. The claimant has the burden of producing a prima facie case before the trial court, lest he suffer a directed verdict against him, just as he, as

the original proponent, had that same burden before the Commission.... The claimant has, moreover, the same burden to persuade the trial court by a preponderance of the evidence that his claim is just as he had to persuade the Commission in the first instance.

(Emphasis supplied).

The presumption of correctness only packs a procedural wallop when the configuration of winning and losing parties is reversed. *General Motors v. Bark,* 79 Md.App. at 80, 555 A.2d 542, spoke to this reversal of roles:

> *The qualifying language only takes on significance when it is the claimant who has prevailed before the Commission and the defendant/insurer who appeals to the circuit court.* It is then that the allocation of burdens switches. In such a case, the decision of the Commission is, *ipso facto,* the claimant's *prima facie* case and *the claimant runs no risk of suffering a directed verdict from the insufficiency of his evidence before the circuit court.* Indeed, *the successful claimant,* as the non-moving party on appeal, *has no burden of production.*

(Emphasis supplied).

This phenomenon of shifting burdens was first discussed eighty-five years ago in *Stewart & Co. v. Howell,* 136 Md. 423, 434, 110 A. 899 (1920):

> [I]t simply puts the burden of proof upon the party taking the appeal, whether he be plaintiff or defendant. In other words *it establishes no new rule when the plaintiff happens to be the party appealing, as the burden was always upon the plaintiff to prove his case. But it shifts the burden from the plaintiff to the defendant where the defendant loses before the Commission and desires to appeal from its decision,* requiring the defendant in such a case to satisfy the jury by a preponderance of testimony that the plaintiff is not entitled to the award made by the Commission.

(Emphasis supplied).

 If the claimant prevails before the Commission and the employer prays a trial *de novo* before the circuit court, it

is the employer who has become the moving party and who seeks to upset the status quo. It is the employer, therefore, who assumes, at that level, the burdens of both production and persuasion. *Kelly v. Baltimore County,* 161 Md.App. at 137, 867 A.2d 355.

## 1. The Burden of Production

The switch in the allocation of the burden of production has immediate significance for the subject of summary judgments and directed verdicts. A logically ineluctable consequence of the reallocation of the burden of production is that the party which prevailed before the Commission and is, therefore, the non-moving party before the circuit court cannot suffer a summary judgment (or, perhaps, a directed verdict at the end of the plaintiff's case) against it on the ground that it failed to produce a prima facie case. Pressman, *op. cit.,* § 4–24(4), p. 186, stated the principle:

> An appellant cannot have a directed verdict on the ground that it had successfully borne the burden of proof imposed upon it, in view of the presumptive correctness of the decision of the Commission.

After an incisive and scholarly review of this particular impact of the reallocation of the burden of production on summary judgment motions at the circuit court level, Judge Meredith concluded in *Kelly v. Baltimore County,* 161 Md. App. at 154, 867 A.2d 355:

> *[I]f the claimant was the prevailing party before the Commission,* and the employer has requested a jury trial *de novo, the presumption of correctness* of the Commission's ruling *precludes the circuit court from ruling* as a matter of law, *upon a motion for summary judgment, that the claimant's evidence of a prima facie case will be insufficient.*

(Emphasis supplied).

Summary judgment, of course, may be granted in a *de novo* Workers' Compensation trial as readily as in any other type of case. *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138–39, 265 A.2d 256 (1970); *Talley v. Department of*

*Correction,* 230 Md. 22, 28, 185 A.2d 352 (1962); *Dawson's Charter Service v. Chin,* 68 Md.App. 433, 440, 511 A.2d 1138 (1986) ("[S]ummary judgment may be invoked to prevent an unnecessary trial in a worker compensation appeal, just as in any other action."); *Maloney v. Carling National Breweries,* 52 Md.App. 556, 560, 451 A.2d 343 (1982); *Egypt Farms v. Lepley,* 49 Md.App. 171, 176, 430 A.2d 122 (1981) ("[T]he normal rules governing summary judgment apply with equal force to Workmen's Compensation appeals.").

Our statement that the party who prevailed at the Commission level may not, at the circuit court level, suffer a summary judgment against it on the ground that it failed to produce a prima facie case is not an exception to or exemption from this well-established summary judgment law. It is, rather, the case that, because of the role-reversal, the requirements for summary judgment will not have been satisfied. The party that prevailed before the Commission will be, at the circuit court level, the non-moving party, with no burden of either production or persuasion. That party need do nothing and need produce nothing. That party can ultimately prevail simply by relying on the failure of the opposing party to produce or to persuade. That prevailing party, by definition, cannot have failed to satisfy a burden of production because that party had no burden of production.

A totally redundant but closely related rationale would be that even if, *arguendo,* that prevailing party had some burden of producing a prima facie case, the substantive evidence of the presumptively correct decision of the Commission would, *ipso facto,* satisfy that burden. *Kelly v. Baltimore County,* 161 Md.App. at 145, 867 A.2d 355. This does not mean, of course, that either party at the *de novo* trial would not be vulnerable to summary judgment on various legal grounds or that the party with the burden of production would not be vulnerable for failing to satisfy that burden. For the prevailing party and on purely factual grounds, however, this invulnerability to summary judgment represents not a case of the summary judgment law inapplicable, but of the summary judgment law satisfied.

Let it be carefully noted, moreover, that when a motion for summary judgment based on evidentiary insufficiency is made in the course of a trial *de novo* at the circuit court, the propriety of summary judgment will be assessed exclusively in the context of the evidence then being offered before the circuit court and in light of the allocation of the burden of production before the circuit court. The consideration of summary judgment at the circuit court level does not subsume consideration of whether summary judgment, had the procedural rules permitted it, would have been appropriate before the Commission, where, *inter alia*, the allocation of the burden of production might have been diametrically different. Once the trial *de novo* is in progress at the circuit court level, that becomes the only universe that matters. Any question of evidentiary sufficiency before the Commission is, at that point, ancient history.

In *Thistle Mills v. Sparks*, 137 Md. 117, 111 A. 769 (1920), the Commission had decided the ultimate factual question in favor of the claimant, and the employer sought *de novo* review by a circuit court jury. The circuit court judge granted a directed verdict on the issue of the legal insufficiency of the claimant's case in favor of the employer and the Court of Appeals reversed that decision, saying, *id.* at 121, 111 A. 769:

> *In view of the* effect, as to *presumptive correctness, given* by the statute *to the decisions of the State Industrial Accident Commission, and of the burden of proof placed upon the appellant* in such cases (Code, Art. 101, Sec. 56), *the court below would not have been justified in directing a verdict for the appellant* on the ground that it had successfully borne the burden thus imposed.

(Emphasis supplied).

In *Bell v. Steen*, 137 Md. 388, 392, 112 A. 584 (1921), the Court of Appeals held to the same effect, stating that, once the claimant has prevailed before the Commission, the burden of proof is reallocated to the appealing employer and the original claimant no longer bears any burden of proof.

In the case at bar, *the question* whether the accident arose out of and in the course of the employment *had been decided in favor of the claimant by the* State Industrial Accident *Commission and the burden of proof,* as provided by the statute, *rested upon the parties appealing from that decision,* and attacking the same.

(Emphasis supplied).

*Weston–Dodson Co. v. Carl,* 156 Md. 535, 540, 144 A. 708 (1929), was equally emphatic that, at the circuit court level, any insufficiency in the evidence will work against the appealing party and not against the party enjoying the presumption that the Commission's decision was correct.

*[A]s the* commission awarded compensation, and the *burden* of establishing error in its findings *was* by this fact *cast upon the employer and insurer* on their appeal under section 56 of the act, *insufficiency of any sort in the proof must work against them.*

(Emphasis supplied). See also *Frazier & Son v. Leas,* 127 Md. 572, 576, 96 A. 764 (1916); *Taylor v. Ramsay Co.,* 139 Md. 113, 122, 114 A. 830 (1921); *Jewel Tea Co. v. Weber,* 132 Md. 178, 181–83, 103 A. 476 (1918); *Coastwise Shipbuilding v. Tolson,* 132 Md. 203, 206–08, 103 A. 478 (1918); *Beasman & Co. v. Butler,* 133 Md. 382, 384–86, 105 A. 409 (1918); *Harrison v. Central Construction Corp.,* 135 Md. 170, 180, 108 A. 874 (1919); *Baltimore Dry Docks Co. v. Hoffman,* 142 Md. 73, 76–77, 120 A. 227 (1923); *Aetna Life Insurance Co. v. Bittinger,* 159 Md. 262, 268–70, 150 A. 713 (1930); cf. *Ackerhalt v. Hanline Brothers,* 253 Md. 13, 252 A.2d 1 (1969).

In terms of the impact on summary judgment that a switch in the allocation of the burden of production can have, *Thomas v. Thompson, supra,* is a textbook example. The only significant factual issue in that Workers' Compensation case was the causal connection between a work-related injury on October 7 and a herniated disc that manifested itself on the following June 3. The claimant, as the moving party, had initially borne both the burden of producing a legally sufficient case and the burden of persuading the Commission to find in his favor.

Before the Commission, the appellee, as claimant, assumed the full burden of proving his case. *As proponent of the proposition that there was a causal connection* between the accident of October 6 and the disability of June 3, *he had 1) the burden of production of a prima facie or legally sufficient case* to permit the Commission to find in his favor, as a matter of law; *and 2) the burden of persuasion* to convince the Commission so to find, as a matter of fact.
114 Md.App. at 363, 689 A.2d 1301 (emphasis supplied).

Before the Commission, the claimant successfully carried both burdens, and the Commission, accordingly, made an award in his favor. The employer appealed the Commission's decision to the circuit court by requesting a *de novo* trial on that issue of causation. The essential *de novo* trial, of course, did not carry the litigation back to square one, but took into account the antecedent history before the Commission as a presumptively correct decision that had to be given its proper legal effect.

*That legally established linkage* between the precipitating event of October 6 and its consequence as of June 3 thereby *became* the prevailing and axiomatic reality—*the documented status quo*—the given—*from which all subsequent litigation would be required to proceed.*
114 Md.App. at 364, 689 A.2d 1301 (emphasis supplied).

For a number of reasons, not here pertinent, the issue of causation in that particular case was determined by this Court to have been a complicated medical question, thereby calling for expert medical testimony. 114 Md.App. at 371–83, 689 A.2d 1301. Neither party offered any such expert medical testimony. Necessary proof was lacking. But proof of what? Whichever party bore the burden of production with respect to causation or lack of it, therefore, ran the risk of suffering an adverse motion (for summary judgment or for a judgment at a later stage of the case), as a matter of law. In *Thomas v. Thompson*, the trial judge granted a motion for judgment against the employer at the end of the employer's case in chief. The employer appealed to this Court and we affirmed

the trial judge's decision. What we said in *Thomas v. Thompson* about granting a judgment at the end of the plaintiff's case for the failure to meet a burden of production would apply with equal validity to the granting of summary judgment.

Before us, the employer complained bitterly that the claimant "had not provided any medical testimony of causal relationship." 114 Md.App. at 368–69, 689 A.2d 1301. In rejecting that argument, we explained why the claimant, as the prevailing party below, had no burden to prove anything.

Such observations might have been apposite if the appellee had had some burden of proof, but, of course, he had none. *The appellee was not required to prove anything. He had no burden of production.* Even on the question of ultimate persuasion, had the case gone that far, he could have offered nothing and simply relied on the failure of the appellants to rebut the presumption of correctness of the Commission's earlier ruling.

*When an appeal to the circuit court from the Workers' Compensation Commission is in the posture of this case,* to wit, with the claimant's having prevailed before the Commission, *the "essential trial de novo" is, in effect a mirror image of the earlier hearing before the Commission.* With respect to the duty of going forward with evidence, the allocations of both burdens of proof, and even instructions as to the factual status quo that is the point of departure, *everything has become the reverse image of what once it was.* Whereas once the right hand had had to push all the buttons and turn all the knobs, it was now the left hand that has to do so.

114 Md.App. at 369, 689 A.2d 1301 (emphasis supplied).

The critical difference between a true trial *de novo* and an essential trial *de novo* is that the presumption of correctness had created a reverse situation in which the proposition to be proved at the circuit court level had switched from one of causation to one of non-causation.

Generally speaking, when the relationship between an earlier injury and a subsequent disability presents a complicated medical question so that expert medical testimony would be required to establish a prima facie case of *causation*, expert medical testimony would also be required, when the allocation of the burden of production is reversed, to establish a prima facie case of *non-causation*. If the possible relationship between two medical events represents a difficult medical issue, *it would make little or no difference whether we were, depending on the vagaries of trial procedure, attempting to connect or to disconnect the two events*. Expert medical knowledge as to the expected sequelae of an injury would be equally valuable and, indeed, necessary, regardless of the direction in which the burden of proof was moving.

114 Md.App. at 383–84, 689 A.2d 1301 (emphasis supplied and in original).

On the question, therefore, of whether a party can ever suffer summary judgment against it at the circuit court level for failing to produce or promise to produce a legally sufficient case, the answer will depend entirely on whether that party does or does not have allocated to it the burden of production.[9]

---

**9.** The invulnerability of the non-moving party, to wit, the party without the burden of initial production, to an adverse summary judgment (or, perhaps, an adverse judgment at the close of the plaintiff's case) on the ground of evidentiary insufficiency does not necessarily imply that that party would thus remain invulnerable at the end of the entire case or from a judgment n.o.v. As *American Airlines v. Stokes*, 120 Md.App. at 363, 707 A.2d 412, discussed, developments in the course of a trial might generate some burden of production that had not existed at the outset of the trial. If, for instance, some development in the case should cause an initially non-medically complicated question of causation to escalate into a medically complicated question in that regard, an incremental burden of producing an expert medical witness might accrue and might attach to either party or both, with all the attendant risk of non-production.

It is clear that *evidence,* including expert medical testimony, establishing the possibility of an alternative theory of causation may be the decisive factor *that transforms a non-medically complicated question of causation, requiring no expert medical testimony, into a complicated medical question, requiring such testimony as a matter of law.* Evi-

That, in turn, will depend entirely on whether that party had or had not been the prevailing party before the Commission. In terms of framing the issue to be proved at the circuit court level, the burden on the appellant is to disprove whatsoever it was that had earlier been proved before the Commission. As we finally explained in *Thomas v. Thompson:*

> In the present case, *we hold that expert medical testimony was as surely required for the appellants to prove non-causation as it would have been required for the appellee to prove causation, had the decision of the Workers' Compensation Commission gone in the opposite direction.* Before the Commission, the status quo was that there was no causal relationship between the events of October 6 and June 3. The appellee, as claimant, was the proponent who was required to prove that there was such a relationship. He successfully did that. *Before the circuit court,* therefore, *the new status quo was that there was a causal relationship* between the events of October 6 and June 3.

dence of such an alternative theory of causation would be capable of performing this transforming function regardless of which party introduces it and regardless of the stage of the trial at which it is introduced.[4]

[4] The implications of this are significant. If 1) evidence introduced in the course of a trial may escalate an initially non-medically complicated question into a medically complicated one and 2) such an escalation increases the qualitative burden of proof on a plaintiff to be entitled to take a case to the jury, that necessarily means that *the burden of production may shift in the course of a trial. What might have satisfied the burden of production at the end of the plaintiff's case need not necessarily satisfy the burden of production at the end of the entire case.* This phenomenon is not as anomalous as it might at first appear. There is no increase in the number of substantive elements of the proposition to be proved (the crime, the tort, the breach of contract, etc.) by the proponent; *there is* only, as a result of unfolding trial developments, *an enhancement of the quality of proof required to establish a prima facie case as to one of those elements.* (Emphasis supplied).
Invulnerability from summary judgment on the ground of failure to satisfy the burden of production is not necessarily, though it sometimes will be, invulnerability from all later judgment, as a matter of law, on that ground.

*The appellants became the proponents and took on the affirmative burden of proving non-causation.*

114 Md.App. at 384, 689 A.2d 1301 (emphasis supplied). *See also Kelly v. Baltimore County,* 161 Md.App. at 138–39, 867 A.2d 355.

## 2. The Burden of Persuasion

The presumption of correctness also has a procedural impact on the burden of persuasion. Once the burden of production has been satisfied and an issue has been submitted to the fact finder for resolution, the fact finder has the unfettered prerogative to find in either direction. The presumption of correctness of the factual decision made by the Commission, however, provides a guideline to assist the fact-finding judge or jury in its deliberations.

Through the medium of jury instructions, the guideline will be made known to the jury. Through the medium of well-settled caselaw, the guideline is presumptively well understood by the fact-finding judge. As we have previously discussed, the jury will be informed about precisely what it was that the Commission decided. The jury will be further informed 1) that the Commission's decision is relevant evidence to prove the proposition which the Commission decided; 2) that the decision of the Commission is presumptively correct; and 3) that the jury is free to give that presumption of correctness whatever weight, great or small, it chooses to give it.

As we explained in *General Motors v. Bark,* 79 Md.App. at 80, 555 A.2d 542, the presumption of correctness is offered to the fact finder as a factual tie-breaker.

> The qualifying language also gives the successful claimant below the edge—the tie-breaker—if the mind of the fact finder (judge or jury) is in a state of even balance. *The tie goes to the winner below.*

(Emphasis supplied).

Judge McWilliams discussed the impact of the allocation of the burden of persuasion in *Blake Construction Co. v. Wells,* 245 Md. 282, 286, 225 A.2d 857 (1967):

The decision of the Commission is, of course, prima facie correct and the burden of proof is upon the party attacking the same. Code, Art. 101, § 56(c). This means nothing more than that, *if the mind of the trier of facts is in equal balance on the evidence* in the record, *the finding of the Commission should be affirmed.*

(Emphasis supplied). See also *Greenwalt v. Brauns Building Specialties Corp.*, 203 Md. 313, 318, 100 A.2d 804 (1953); *Stewart & Co. v. Howell*, 136 Md. 423, 434, 110 A. 899 (1920); *Dent v. Cahill*, 18 Md.App. 117, 124, 305 A.2d 233 (1973).

*Pressman, op. cit.*, § 4–25(2), p. 188, similarly explained:

Even though the decision of the Commission is presumed to be correct and the burden is upon the party attacking the decision, it is not necessarily a burden of additional proof. It means that *if the mind of the trier of facts or the minds of the jury are in equal balance on the evidence, the finding of the Commission should be affirmed.* If the appellant can convince the trier of facts (even if tried on the Record) that the Commission erred in interpreting the facts, he has met the burden of proof.

(Emphasis supplied).

### Judge Rowan's Decision

Having failed to prevail at the Commission level, it was the claimant who, before Judge Rowan, bore the burdens of both production and persuasion. Through her own testimony and that of Diane Sorano and Diane Arabian, the claimant successfully established a prima facie case, to wit, a legally sufficient case, that she had sustained an injury 1) in the course of and 2) arising out of her employment. She successfully shouldered her burden of production.

Judge Rowan, in his fact-finding capacity, then found, as a matter of fact, that the claimant had also "carried the burden of proof by a preponderance of the evidence that the decision by the Workers' Compensation Commission was error." The claimant thus successfully shouldered her burden of persua-

sion. Montgomery County seeks to convince us that Judge
Rowan was in error.

### Montgomery County's Theory of the Case

In the face of the testimony before Judge Rowan of the
claimant herself and of two other witnesses to the ultimate
battery, Montgomery County could not seriously contest the
fact that the claimant, as she was about to board a bus as part
of her job as a bus attendant, was physically attacked.

So, she pushed me back this way (indicating). She put her
foot in my chest and started punching me, hitting me in the
head, pulled my earring completely out of my ear.

As an affirmative defense, however, Montgomery County
sought to counteract the impact of that battery by introducing
evidence of an antecedent verbal confrontation between the
claimant and the ultimate assailant that had occurred in the
break room. Montgomery County's theory of defense was
that the verbal abuse heaped on Angela Harris by the claim-
ant precipitated the battery and was its effective proximate
cause. Two alternative legal defenses were based on the
alleged verbal abuse and its sequelae. It was urged by
Montgomery County that the claimant, as an employee, was
guilty of wilful misconduct so as to bar her from recovery. It
was also urged that the battery did not arise "out of" the
employment but resulted directly from the non-work-related
quarrel.

■ A quick look at the caselaw, however, immediately
reduces Montgomery County's defense from a two-pronged
argument to the single contention that the claimant was guilty
of wilful misconduct. The other prong—that the injury did
not result from a work-related accident—collapses on contact.
The claimant indisputably suffered an accidental personal
injury. Section 9–101(b)(1) and (2) defines "accidental person-
al injury" as including:

(b) *Accidental personal injury.*—"Accidental personal in-
jury" means:

(1) an accidental injury that arises *out of* and *in the course of* employment;

(2) an injury caused by a willful or negligent act of a third person directed against a covered employee *in the course* of the employment of the covered employee.

(Emphasis supplied). What is immediately apparent from contrasting subsection (b)(1) with subsection (b)(2) is that, whereas an accidental injury generally must arise both "out of" and also "in the course of" employment, an injury "caused by a willful ... act of a third person" need only occur "in the course of" the employment.

To Montgomery County's half-hearted protestation that a co-employee is not a "third person" within the contemplation of § 9–101(b)(2), Judge Thompson supplied a sure answer to the contrary in *Schatz v. York Steak House Systems, Inc.,* 51 Md.App. 494, 499, 444 A.2d 1045 (1982):

It appears that the Act itself provides authority for a finding that *a co-employee is a "third person."* ... We conclude that *the definition of third person encompasses a co-employee of the injured worker.*

(Emphasis supplied).

Pressman, *op. cit.* (1972 Supplement), § 2–6(11), pp. 44–45, explains how the Workers' Compensation law was broadened by a 1951 amendment to make compensable injuries inflicted by third persons, pointing out that the 1951 amendment re-defined an accidental injury to include an injury caused by the willful or negligent act of a third person directed against an employee in the course of the employment, and held that *it is not necessary to show that an injury to an employee caused by the willful and negligent act of a third person (a third person includes an employee) must arise out of the employment, but that since the amendment of 1951 it is only essential to prove that the injury, including one resulting from an assault, arose in the course of the employment.*

(Emphasis supplied).

The same issue was before the Court of Appeals in *Giant Food v. Gooch,* 245 Md. 160, 225 A.2d 431 (1967). The

employer there, as Montgomery County here, argued that the attack by a third person must both 1) occur in the course of employment and also 2) arise out of employment. The claimant responded that the 1951 amendment had eliminated that dual requirement.

The critical issue is whether Gooch, having been shot by a third person while in the course of his employment, must establish that his injury arose out of his employment in order to obtain compensation. The employer and insurer contend that § 15 of Art. 101 of the Code of 1957 controls when, *inter alia*, it provides that "every employer * * * shall pay * * * compensation * * * for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment * * *." Gooch answers that § 15 governs the general and usual cases and that in those cases both the tests of "in the course of" and "arising out of" the employment must concur, but that in § 67(6) of Art. 101 of the Code, enacted by Ch. 289 of the Laws of 1951, in the particulars here pertinent, *the legislature created a new, different and additional form of accidental personal injury which, if caused by "the wilful or negligent act of a third person directed against an employee," need only occur in the course of employment (and not arise out of it) to be compensable.*

245 Md. at 162–63, 225 A.2d 431 (emphasis supplied).

Chief Judge Hammond, 245 Md. at 165–66, 225 A.2d 431, emphatically stated that it is enough if such an injury is inflicted in the course of employment.

The legislature is presumed to have enacted Ch. 289 of the Laws of 1951 with knowledge of the state of the law and the decisions referred to. It is only reasonable to infer, therefore, that *the legislature* when it said that accidental personal injury as defined and made compensable by § 15 of Art. 101 was also to include "an injury caused by the wilful or negligent act of a third person directed against an employee in the course of his employment" *intended to broaden the scope of the compensation statute to include as*

*compensable an injury not attributable to the working environment provided it was incurred in the course of employment.*

This conclusion is fortified by another facet of history. The bill which became Ch. 289 of the Laws of 1951 and now is codified as § 67(6), as originally introduced in the legislature, contained this language: " \* \* \* and includes an injury caused by the wilful or negligent act of a third person directed against an employee *because* of his employment," but during its passage the bill was amended to strike out the word "because" and to substitute the words "in the course." *This is a persuasive indication of legislative intent to insure that in the case of injury inflicted by a third person in the course of the worker's employment there was to be no requirement that the injury arise out of the employment.*

(Emphasis supplied). See also *Smith v. General Motors Assembly Division,* 18 Md.App. 478, 482–84, 307 A.2d 725 (1973); *Mack Trucks, Inc. v. Miller,* 23 Md.App. 271, 272 n. 1, 326 A.2d 186 (1974).

 The claimant was assaulted by Angela Harris as she was about to board the bus whereon she was to work. There is no doubt that at that time she was in the course of her employment. *May Department Stores v. Harryman,* 65 Md. App. 534, 541, 501 A.2d 468 (1985). Judge Rowan's findings as to the injury's having occurred in the course of employment were both 1) clear and 2) clearly supported by the evidence.

*The alleged battery by the co-employee took place* by all accounts *outside the Montgomery County bus dispatcher window on the school bus parking lot at or about 1:30 p.m., the time when all of the bus personnel, including the Claimant, began the afternoon runs to pick up the children.* The Claimant, the witnesses, and even Angela Harris agree that the first *physical* act between Harris and the Claimant was Harris pushing the Claimant outside the dispatcher's window. From there the squabble escalated with the pulling of hair by Harris and throwing of a water bottle by the

Claimant. Thus, *the Claimant, by reason of time, place and circumstances, was in the course of employment, and any accidental injury caused by the willful act of pushing and shoving by a co-employee, absent any defense, would be compensable.*

(Emphasis supplied).

Montgomery County's defense, therefore, is reduced to the single argument that the claimant had earlier been guilty of willful misconduct and that that misconduct *ipso facto* barred her from recovering. The County's reliance is on § 9–506(e), which provides in pertinent part:

A covered employee ... is not entitled to compensation or benefits under this title as a result of an accidental personal injury, ... if the accidental personal injury ... was caused by the willful misconduct of the covered employee.

See generally *Karns v. Liquid Carbonic Corp.*, 275 Md. 1, 12–21, 338 A.2d 251 (1975); *Harris v. Dobson & Co.*, 150 Md. 71, 76–77, 132 A. 374 (1926); *Baltimore Car Foundry Co. v. Ruzicka*, 132 Md. 491, 493–95, 104 A. 167 (1918), on the subject of willful misconduct.

### An Unpersuasive Defense

It is unnecessary to immerse ourselves any more deeply in the detail of willful misconduct law, however, because Judge Rowan was not persuaded that any willful misconduct had ever occurred. The subject had, indeed, been raised before the Commission and testimony, both pro and con, had been offered with respect to it. It was, therefore, an appropriate factual issue for possible consideration at the *de novo* trial. Both the claimant and Angela Harris testified before Judge Rowan, essentially just as they had done before the Commission.

In his Memorandum Opinion and Order, Judge Rowan summarized the two diametrically different versions of the build-up to hostilities.

From an evidentiary standpoint, on the Claimant's side there was a denial of any racial term or provocative word

said to Ms. Harris, an African American. The Claimant described a situation in a T.V. waiting room at around 1:15 p.m. wherein she left the room where she was watching one particular channel for a short time, returned, and found the channel turned. She asked Angela Harris as to whether or not she had changed the channel. Upon Harris' affirmative response the Claimant stated she said: "I wanted to watch channel 7 but it's just as well because I have to go on my bus run." Harris responded by saying: "Are you talking to me?" to which the Claimant responded: "No." At that point the Claimant's evidence reflects that Harris threatened the Claimant, followed her outside, and ultimately after other words pushed the Claimant, kicked her in the chest, pulled some of her hair out, and tore an earlobe. At one point the Claimant threw a water bottle at Harris.

On the Employer's side the evidence reflected that Angela Harris went into the T.V. room, saw no one, turned on the T.V., and the Claimant returned to the T.V. room. The Claimant explained that she had been watching T.V., which Harris denied, which led to an argument in which the Claimant allegedly called Ms. Harris a "bitch and nigger." Harris followed the Claimant outside and the fight ensued with the first physical act coming from Harris.

Judge Rowan recognized that Montgomery County was raising the affirmative defense of willful misconduct as a bar to the claimant's recovery for an otherwise compensable injury.

The Employer and Insurer raise the defense of "willful misconduct," namely, that the Claimant spoke provocative language to Harris which led to the fight. In effect, the employer argues misconduct on the part of the Claimant by the use of provocative language that exposed the Claimant to the fight and resulting injuries.

The judge did note some skepticism as to whether the mere use of provocative words, even if proved, could qualify for what the caselaw requires to prove willful misconduct. He referred to *Williams Construction Co. v. Garrison*, 42 Md.

App. 340, 346, 400 A.2d 22 (1979), which defined "willful misconduct" as

the intentional doing of something either with the knowledge that it is *likely to result in serious injury or with a wanton and reckless disregard of its probable consequences.*

*Misconduct includes the exposure by an employee to an injury if he knows of, and appreciates, his liability to injury.* An employee is not guilty of willful misconduct because he is negligent or because he acted imprudently, thoughtlessly, or unwisely.

(Emphasis supplied). The opinion of Judge Liss went on to state that

*willful misconduct may be found where the employee intended to place himself in a position whereby he might expect to meet with injury or death,* and in carrying out his intention meets his death as a result of the injuries sustained. *The actions of the employee must be such as to show that he intended thereby to place himself in such a hazardous position that injury or death might result as the reasonable consequence of his act.*

*Id.* (emphasis supplied).

It is highly problematic whether mere words that might provoke a third person to anger could qualify for the caselaw's strict definition of willful misconduct. See *Girouard v. State,* 321 Md. 532, 542, 583 A.2d 718 (1991); *Sims v. State,* 319 Md. 540, 552, 573 A.2d 1317 (1990); *Price v. State,* 82 Md.App. 210, 217, 570 A.2d 887, *cert. denied,* 320 Md. 16, 575 A.2d 742 (1990); *Lang v. State,* 6 Md.App. 128, 132, 250 A.2d 276 (1969); cf. *Downs v. State,* 278 Md. 610, 617–18, 366 A.2d 41 (1976). Judge Rowan found it unnecessary to resolve that legal issue, however, because he rejected the factual predicate on which the issue necessarily rested. It rested on a determination of what precisely had happened in the break room between the claimant and Angela Harris.

What is not clear is what factually preceded the confrontation in front of the dispatch window between Angela Harris and the Claimant.

With what we can only describe as a touch of judicial gallantry, Judge Rowan desisted from labeling either the claimant or Angela Harris a liar, notwithstanding the logically ineluctable conclusion that at least one of them almost certainly was. At the end of the trial *de novo,* Judge Rowan gently addressed both the claimant and Ms. Harris.

I want both of you to understand, I am not discarding your respective version, ma'am, of what happened or your respective version of what happened. Apparently, you have a good reputation there. There is nothing to indicate that your story is untrue.

In his Memorandum Opinion and Order, he remained graciously impartial and non-judgmental.

As the Court noted at the conclusion of the case, both the Claimant and Ms. Harris were credible witnesses.

Notwithstanding that politic flourish, Judge Rowan recognized full well that both versions could not be true and that he would have to look elsewhere for a resolution.

*Someone has colored the facts because the stories are diametrically opposed.* The parties know who is doing that, but *I can't make any judgment about it.* Having said what I have said today, you understand where I'm coming from and where I'm going.

(Emphasis supplied).

At the conclusion of the trial *de novo,* Judge Rowan stated, "As each of you know, my mind is in a state of equipoise." Montgomery County seizes upon that comment as a decisional absolute, compelling, as a matter of law, that the presumptively correct decision of the Commission be affirmed. As we narrow our final focus, it is clear that the judge's "state of equipoise" referred, at most, to the antecedent confrontation in the break room and not to the ultimate assault on the claimant as she was boarding a bus.

Even granting that the claimant and Angela Harris cancelled each other out testimonially as to what may have happened in the break room, on the ultimate issue before the

court of whether the claimant suffered an injury in the course of her employment, two other witnesses testified. As to what happened outside, they both supplied substantive evidence and also corroborated the claimant as to the assault on her.

Diane Sorano was looking out a large window in the dispatch office and observed the scene.

I was facing the window. I kept staring outside when I saw Joannie Spradlin and the lady standing there, her driver, standing there in front of her. They were changing words. I couldn't hear anything, of course, because I'm inside and they were outside.

*That person came at her.* All I saw was that Joannie blocked her face and [Ms. Harris] *came at her and hit her in her face and pulled her hair. After that, I didn't see her no more because her body went down.* They know there is a big window and you can't see the bottom part, how she fell, or where she fell, but basically that's what I saw.

(Emphasis supplied).

She explained that she saw Ms. Harris strike Ms. Spradlin, but never saw Ms. Spradlin strike Ms. Harris.

Q Did you see Ms. Spradlin strike Ms. Harris at all?

A Not at all.

Q *You indicated you saw Ms. Harris strike Ms. Spradlin and pull her hair?*

A *She did strike her and pull her hair. Yes.*

(Emphasis supplied).

The other neutral witness was Diane Arabian. Although she left the scene before she saw any blow struck, she clearly indicated that Ms. Harris was the aggressor.

I was standing outside waiting for my bus, my driver to pick me up. I saw Joannie coming out. Janie was behind her. They were very loud and that's why she was very loud. I turned around to see what was going on. *She followed Joannie.* Joannie stopped in front of the window from the annex. *She was waiving her finger at her. Joannie kept*

*going back and back because she was getting too close to her. At one point, Joannie put her hands like this to stop.*

Q *Over her face?*

A *Yes, over her face.* Then at that moment, I kept saying, isn't somebody going to stop them? Then I proceeded going inside the annex. Then somebody came out. Then my bus arrived and I had to leave. Then at that moment, *I asked Joannie if she was all right. She looked pretty shaken up.* That's all I saw.

(Emphasis supplied).

Judge Rowan, far from being in a state of mental equipoise as to the ultimate issue before him, was affirmatively persuaded that the claimant had suffered an injury in the course of her employment, and the evidence amply supported that decision. The judge's ultimate *de novo* decision, therefore, was not clearly erroneous.

██ Judge Rowan's state of mental equipoise, for whatever significance that might have, referred only to the antecedent events in the break room. At most, therefore, it might have had a bearing on the affirmative defense of willful misconduct. On that issue, the only two witnesses to the earlier verbal confrontation did testimonially cancel each other out and the net persuasiveness of the affirmative defense was, therefore, zero. Because it bore the burden of persuasion as to that defense, Montgomery County, having failed to carry that burden, lost on the issue. As Judge Rowan concluded:

The Court does not reach the decision as to whether or not the use of the provocative words was "willful misconduct." Assuming for the purposes of argument that Montgomery County had rules prohibiting the use of racial epithets among co-employees, or assuming there were rules prohibiting fighting (see Larson, Vol. 1A, Section 32.00, 1993 Edition), *the Court does not find "willful misconduct" on the part of the Claimant because the burden of proof as to what preceded the fight has not been carried by the Employer;* and the Court cannot determine what factual scenario actually preceded the fight. As the Court noted at the

conclusion of the case, *both the Claimant and Ms. Harris were credible witnesses and the Court could not make a determination as to credibility between the two diametrically opposed versions of the events.*

(Emphasis supplied).

### An Ingenious Argument

At this point, Montgomery County descends with microscopic intensity into the arcane procedural labyrinth of the essential trial *de novo.* Unable to maintain that Judge Rowan was wrong, as a matter of fact, in failing to credit the willful misconduct defense, the County argues that his failure to credit the defense was clearly erroneous, as a matter of law.

Its first premise is that the Commission had earlier decided, as a matter of fact, that the claimant, by her provocative language, was guilty of willful misconduct and thereby barred from recovering. To be sure, the Commission made no mention of any such finding, but Montgomery County, invoking *Trojan Boat Co. v. Bolton,* 11 Md.App. 665, 276 A.2d 413 (1971), claims that it was, of necessity, an implicit decision.

Because it had been the prevailing party before the Commission, Montgomery County then seeks to endow that favorable "implicit decision" with the presumption of correctness and to impose upon the claimant the burdens of both production and persuasion to **DISPROVE** that she was guilty of willful misconduct.

Montgomery County's conclusion then follows that when the fact finder's mind ended up in a state of "equipoise," and he thereby failed to make any finding with respect to what happened in the break room, that necessarily meant that, once the conflicting proofs cancelled each other out, there was no longer any legally sufficient evidence before him to permit him to overcome the presumption that the claimant had, indeed, been guilty of willful misconduct. The argument is essentially that the failure to find willful misconduct was clearly erroneous in that Judge Rowan himself failed to follow, in his fact-finding, the very guidelines about which he would have been

required to instruct a jury, to wit, that if the mind of the fact finder is in equipoise, the fact finder should indulge the presumption of correctness and, on that issue, find against the party who bore the burden of rebutting the presumption.

It is, indeed, a clever and ingenious argument. It is, however, flawed.

### Flaw # 1:

### Reliance on the Status of an Implicit Decision

In the long 91–year history of Workers' Compensation law, there has never been a case suggesting that the presumption of correctness, on an essential *de novo* appeal, would apply to an implicit decision made by the Commission. The only time, to the best of our knowledge, that the phrase "implicit decision" has ever appeared in the case law was in the opinion of Judge Thompson for this Court in *Trojan Boat Co. v. Bolton,* 11 Md.App. at 671–72, 276 A.2d 413. He used the term seven times over the course of two pages and his definition has understandable attraction for Montgomery County in this case.

> Briefly stated, *an implicit decision* by the Commission *is one that,* in the logical process of disposing of the proceeding, *the Commission encountered and solved, although without explicit mention of it* in the record. By their very nature, they are elusive.

11 Md.App. at 671, 276 A.2d 413 (emphasis supplied). Indeed, "they are elusive," as we now seek to pin one down.

Montgomery County's initial semantic problem is that it has ripped the phrase thus defined completely out of the only context in which it has ever been used and has attempted to transplant it into a totally different setting in which it has never heretofore been employed. In *Trojan Boat,* the employer challenged a Workers' Compensation claim before the Commission on two separate grounds. It argued 1) that no accidental injury had occurred and 2) that there was no evidence of a causative connection between the accident and the subsequent disability. The Commission disallowed the

claim by finding that "the claimant did not sustain an accidental injury arising out of and in the course of his employment." As we explained in *Trojan Boat,* the causation issue was moot and was never decided, even implicitly, by the Commission.

[A]s soon as the Commission decided the injury was not accidental and in the course of employment, *the issues of causation and nature of the injury became moot. The issue was obviously not implicitly decided* by the Commission because in the logical process of disposing of the claim by deciding it was not accidental in the course of employment, *the Commission did not reach the issue of causation.*

11 Md.App. at 672, 276 A.2d 413 (emphasis supplied).

On appeal to the circuit court, a jury found that the accident had occurred in the course of employment. The judge, therefore, reversed the decision of the Commission and remanded the case. On remand, the claimant prevailed and, on that occasion, the employer appealed, challenging the proof of causation. The claimant interposed a plea of *res judicata,* asserting that the issue of causation could have been raised by the employer on the first appeal but was not, thereby barring any relitigation of the issue. This Court rejected the claimant's argument.

[R]es judicata* does not apply because the precise issue raised in the second appeal could not have been raised in the first appeal.

11 Md.App. at 668, 276 A.2d 413.

It was in that context of *res judicata* law that we used the term "implicit decision," in order to distinguish implicitly decided issues, which might be grist for the *de novo* fact-finding mill, from moot issues, which would not.

*The difficulty with issues rendered moot* by the Commission's disposition of earlier issues *comes* not in the procedure for disposing of them on remand but rather *in differentiating them from the Commission's implicit decisions. The distinction between moot issues and implicitly decided*

*issues,* while abstract and largely undeveloped by the cases, *is crucial since a moot decision is not raisable on appeal.*

11 Md.App. at 671, 276 A.2d 413 (emphasis supplied).[10]

The subject of the presumption of correctness did not remotely surface in *Trojan Boat.* The mere use by the opinion in that case of a provocative phrase is not an adequate predicate for the entirely novel principle of law that Montgomery County seeks to erect upon it.

### Flaw # 2:

### A Commission Decision of Delphic Ambiguity

Even if, purely *arguendo,* we were to give an implicit decision the exalted and preemptive status for which Montgomery County contends, there is no convincing evidence that there was any such implicit decision actually made in this case. The Commission's decision was truly one of oracular ambiguity. Montgomery County, before the Commission, had argued forcefully that the incident did not occur in the course of the claimant's employment.

[S]he didn't have a car, and she couldn't go home and she was sitting in the break room just because she had nothing else to do.

*Her employer did not require her to be in the break room. Her employer did not [incur] a benefit as a result of her being in the break room.* And as a result of that, *I do not believe that based on the facts provided today, that this incident arose out of and in the course of employment.*

(Emphasis supplied). The Commission's decision may well have been on that ground, and that ground alone.

---

**10.** With respect to issues that were held to have been properly before the circuit court because evidence as to them had been before the Commission, as opposed to moot issues, see *Goetze, Inc. v. Pistorio,* 201 Md. 152, 92 A.2d 762 (1952); *Cabell Concrete Block Co. v. Yarborough,* 192 Md. 360, 64 A.2d 292 (1949); *Jackson v. Bethlehem–Sparrows Point Shipyard, Inc.,* 189 Md. 583, 56 A.2d 702 (1948); *Butler Brothers v. Mabin,* 171 Md. 126, 187 A. 872 (1936).

On the other hand, the Commission's decision might have been, properly or not, on the distinct ground that a fight between two employees is not something that arises "out of" the employment. Yet again, the decision might conceivably have been on the ground that no proper evidence had been shown as to an injury or as to medical causation. The Commission's decision might, of course, have been based on a finding of willful misconduct on the part of the claimant. Since that would amount to an exemption from coverage, however, it would be strange that the Commission made no mention of that but used, instead, the language that "the claimant did not sustain an accidental injury arising out of and in the course of employment."

To say that the Commission implicitly decided anything about willful misconduct would be pure speculation. For whatever significance the term may someday acquire, an implicit decision, we hold, must at least be something that probably was decided and not simply a possibility that arguably might have been decided. With respect to this defense, not only is the past not prologue, but the factual proposition being relied on by Montgomery County is not even the past.

### Flaw # 3:

### It Is Not Every Decision That Is Presumed To Be Correct

Even if, again purely *arguendo*, the Commission had made a finding, implicit or explicit, that the claimant was guilty of willful misconduct, that is not, Montgomery County's argument to the contrary notwithstanding, the type of decision that is entitled to the presumption of correctness.

Section 9–745(b) expressly provides that the presumption of being prima facie correct applies to "the decision of the Commission." That is a term of art that has a very precise and limited meaning. It does not embrace every subordinate, intermediate, or subsumed thought process that may have entered into the decisional equation. The same term of art is

used by § 9–737 as it authorizes an appeal to the circuit court by any party aggrieved by "a decision of the Commission."

In *Liggett & Meyers Tobacco Co. v. Goslin,* 163 Md. 74, 78, 160 A. 804 (1932), the Court of Appeals distinguished intermediate findings from the Commission's actual decision.

> [*T*]*he appeal* allowed by the statute *is not from the findings* or opinion *of the commission but from its "decision."* And *by "decision" is obviously meant the order by which it disposes of the case.* If, upon an appeal from its decision, it should appear that it was right and proper, it should be affirmed, even though it also appeared that the findings of the commission were erroneous.

(Emphasis supplied). The order of the Commission disposing of this case was that "the claimant did not sustain an accidental injury arising out of and in the course of employment." It did not elaborate on the thought process that preceded it.

In *Flying "A" Service Station v. Jordan,* 17 Md.App. 477, 480–81, 302 A.2d 650 (1973), Judge Powers wrote for this Court in distinguishing the ultimate decision of the Commission from the various lesser constituent findings that may have contributed to it.

> *A decision of the Commission* which an aggrieved party is entitled to have reviewed by a court *must be an operative order which has the effect of granting or denying some benefit* under the Workmen's Compensation law. *Most often, such a decision is reached by giving effect to multiple findings,* but *it is the ultimate decision* or order, *not each individual finding, which is the basis for judicial review. ... [T]he appeal is from the result, rather than from each of its separate elements.*

(Emphasis supplied). See also *Great American Insurance Co. v. Havenner,* 33 Md.App. 326, 328–29, 364 A.2d 95 (1976).

Even if, *arguendo,* the Commission's dispositive decision that the claimant had not suffered an accidental injury arising out of and in the course of her employment had been based in part on an implicit decision that she had been guilty of willful misconduct, that lesser included "decision" would not be "the

decision of the Commission" that § 9–745(b) endows with the presumption of correctness.

## Flaw # 4

### The Trigger for a Reallocation of the Burdens

In its argument, Montgomery County seeks to push the envelope out even further. In doing so, it pushes past the breaking point. Even if, *arguendo*, the presumption of correctness applied not only to the ultimate "decision of the Commission" but to every contributory element of the thought process, it would still not have the procedural impact that Montgomery County seeks to bestow upon it.

Montgomery County, to be sure, 1) had been the prevailing party before the Commission, 2) was the non-moving party before the circuit court, and 3) had no initial burden of production at the circuit court level. Both before the Commission and before the circuit court, it was the claimant who was the moving party and who had the burden of production. Just as a defendant in a tort case bears the burden of showing contributory negligence, however, the employer in a Workers' Compensation case bears the burden of establishing an affirmative defense, such as willful misconduct.

Montgomery County acknowledges that it bore the burden on that issue before the Commission, but claims that it no longer did so before the circuit court. It argues that the presumption of correctness applied to the "implicit decision" that the claimant was guilty of willful misconduct and, thereby, reallocated to the claimant the burden of **DISPROVING** willful misconduct before the circuit court. Because Judge Rowan 1) could not resolve the credibility battle, 2) ended up in a state of "mental equipoise" as to what had happened in the break room, and 3) made no finding with respect to the antecedent conduct of the claimant in the break room, Montgomery County argues that the claimant, *ipso facto*, failed, as a matter of law, to produce any ultimately persuasive evidence **DISPROVING** the presumptively correct finding of willful

misconduct. The argument is that Judge Rowan, as a fact finder, failed to follow the applicable burden of persuasion.

There was, however, no such lesser included burden of persuasion. The switching of the burden of production that sometimes follows from the presumption of correctness does not reach down that deeply into the machinery of the decisional process. It deals with the overall question of which party bears the responsibility to bring the litigation and basically to prove a case. It can transform the moving party before the Commission into the non-moving party before the circuit court. It is, in that capacity, a strategic reallocation of burdens, but it is not an endless series of lesser tactical reallocations percolating down through every level of the litigation. Montgomery County seeks, however, to treat the basic shift as a critical mass triggering a chain reaction of lesser shifts and turning the trial *de novo* into a procedural Hall of "Mirrors, where left is right and up is down and everything moves in the opposite direction." *Starke v. Starke,* 134 Md.App. 663, 667, 761 A.2d 355 (2000). It would have us "jump down the rabbit hole."

The presumption of correctness and the switch in the allocation of the burden of production that it sometimes triggers, however, has no such Rube Goldberg implications. The employer retains the burden of proving the affirmative defense of willful misconduct at the circuit court level just as surely as it had it before the Commission. The claimant, even in the disadvantaged role of moving party before the circuit court, did not assume an additional burden of disproving an affirmative defense. As to willful misconduct, there was no burden cast on the claimant to produce any, let alone additional, evidence. Neither was there on the claimant any burden of persuasion to disprove willful misconduct.

## The Ultimate Burden of Persuasion

At the trial *de novo,* there was cast on the claimant the burden of persuasion on the ultimate issue. The claimant

successfully satisfied that burden, as Judge Rowan, in his Memorandum Opinion and Order, concluded:

> The Court finds that the Claimant has carried the burden of proof by a preponderance of the evidence that the decision by the Maryland Workers' Compensation Commission was error.

That verdict was supported by evidence and was not clearly erroneous. *Community Realty Co. v. Siskos*, 31 Md.App. 99, 105–06, 354 A.2d 181 (1976).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**